[No. S029588. May 22, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES KEITH RICHARDSON, Defendant and Appellant.

968

COUNSEL

Richard Jay Moller and Karen Kelly, under appointments by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Louis M. Vasquez, Eric L. Christoffersen, Lloyd G. Carter and Kathleen A. McKenna, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MORENO, J.**—Defendant Charles Keith Richardson was convicted by a jury of the murder of April Holley (Pen. Code, § 187, subd. (a)), as to which the jury found true felony-murder special circumstances for burglary, rape, sodomy and lewd and lascivious acts on a child under the age of 14. (Pen. Code, § 190.2, subd. (a)(17).) The jury also convicted defendant of residential burglary (Pen. Code, § 459), forcible rape (Pen. Code, § 261, subd. (a)), lewd and lascivious acts on a child under 14 (Pen. Code, § 288, subd. (b)), and sodomy (Pen. Code, § 286, subd. (c)), all of these counts also involving the murder victim, April Holley.[1] In a bifurcated proceeding, the trial court found true additional allegations that defendant had suffered prior convictions for a serious felony and a sex offense. (Pen. Code, §§ 667, 667.6, subd. (b).) The

---

[1] This was defendant's second trial on these charges. His first trial ended in a mistrial after the jury was unable to reach a verdict.

jury returned a death verdict for the murder. The trial court declined to modify the verdict (Pen. Code, § 190.4, subd. (e)), and sentenced defendant to death.[2] This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).)

We affirm the judgment but, for the reasons given below, remand the case on the issue of restitution. (See *People v. Vieira* (2005) 35 Cal.4th 264, 305–306 [25 Cal.Rptr.3d 337, 106 P.3d 990].)

## I. FACTS

### A. *Guilt Phase*

#### 1. *Overview of Prosecution Guilt Phase Evidence*

The prosecution's theory in this case was that defendant and another man, Steven Brown, raped and sodomized 11-year-old April Holley and then drowned her in the bathtub of the trailer where she lived with her mother and older sister, both of whom were absent the night of the murder.[3] The evidence with which the prosecution sought to convict defendant consisted of the following: (1) defendant's statement to a witness evincing awareness that the victim, whom he knew, was alone on the night she was murdered; (2) defendant's statements in the immediate aftermath of the murder in which he either admitted killing the victim or revealed details about the murder that had not been released to the public; (3) defendant's flight from the scene the day after the murder; (4) defendant's shifting stories in statements he made to the police culminating in an admission—quickly retracted—that he had committed the murder; (5) defendant's statement to a fellow inmate that he had murdered Holley; (6) evidence that pubic hairs found at the crime scene were consistent with defendant's hair; and (7) Steven Brown's subsequent attempt to commit a similar crime against another victim.

The defense disputed each circumstance and statement that connected defendant to the murder and argued that Brown alone committed the crime.

#### 2. *The Events of December 2–3, 1988*

On Friday, December 2, 1988, Naomi Holley took her 11-year-old daughter, April, to the home of a family friend, Melanie Lewis, to spend the

---

[2] Defendant was also sentenced to a total of 21 years on the remaining counts. All further unspecified statutory references are to the Penal Code.

[3] The prosecution believed a third person, then 15-year-old Bobby Joe Marshall, Jr., was also present when the murder occurred; he was initially charged with the murder but this charge was dismissed and he testified against defendant, although denying he was present. Brown was also charged with the Holley murder, tried separately and, upon conviction, also sentenced to death.

weekend with Lewis, Lewis's boyfriend, Richard Schnabel, and their children. Naomi, April, and Naomi's older daughter, Tammy, lived on West Addie Avenue in a neighborhood just south of the City of Tulare called Matheny Tract. Tammy Holley was in jail that weekend. After dropping April off, Naomi spent the night at the home of friends. On Saturday afternoon, she decided to go to a party in Porterville where she spent Saturday night; she did not tell April of her plans.

At Lewis's residence, meanwhile, a $20 bill belonging to Tawny Schnabel, Richard's daughter, went missing and was found in April's coat pocket. On Saturday, December 3, after the theft was discovered, Lewis decided to take April back to her mother and she and April went looking for Naomi. They went to the Holley residence but no one was home. They also looked for Naomi at the house of the friend with whom she had stayed the previous night, but did not find her. Eventually, Lewis took April back to Lewis's residence. She stopped on the way to pick up her sister, who was supposed to babysit while Lewis, Richard Schnabel, and Tawny Schnabel went Christmas shopping that night. After they returned, April biked to the El Rancho Motel to visit her friend Barbara O'Hearn. April arrived about 4:00 p.m. and stayed for an hour before returning to Lewis's residence.

From Lewis's residence, April called her friend, 11-year-old Lisa Matthews, and asked her to come to the Holley residence to spend the night. April pretended that she was talking to her mother. Although Lisa's grandmother refused to allow her to spend the night with April, Lisa agreed to come. Lisa started out for the Holley residence but turned back because it was too cold and foggy. April, meanwhile, got a ride home from Richard Schnabel's two teenage daughters. April arrived at her house between 7:30 and 8:00 p.m. She went to the front door, but could not get in so she went around to the back of the house. Sometime after arriving at her home, April went to the house of a neighbor, Lorraine Hughes, and knocked on her door. Hughes was home but did not answer the door. She last saw April walking back in the direction of her own house.

Defendant also lived in Matheny Tract with the Marshall family in the Marshalls' trailer, not far from where April lived.[4] Living in the Marshalls' residence was Bob Marshall, Sr., his sister Linda Land, his sons, Michael and Bobby Joe Marshall, Jr., and Michael Marshall's girlfriend, Carol Brouchard. Defendant was friendly with April's older sister, Tammy, and had visited her at the Holley residence. Naomi Holley testified that defendant had only been at her house on two occasions and had never spent the night there. Her friends, Roger Rummerfield and Renee Bailey, who were almost daily visitors

---

[4] The distance between the Marshall residence and the Holley residence was 998 feet and could be covered in slightly more than four minutes on foot.

to her house, testified that defendant had only been in the house two or three times in November and December 1988. According to Naomi Holley, the last time defendant had been at the Holley residence was on November 11, 1988. On that date, April and another child, Kenny Maxwell, were drawing pictures, and April drew two pictures for defendant. Naomi Holley saw these pictures in her house on Saturday, December 3, before she left for Porterville.

On that Saturday, defendant went back and forth between the Marshalls' house and the nearby residence of Barney Hernandez. Defendant was friends with Barney Hernandez's nephew, Robert Hernandez, who lived with his uncle. On one of these visits, around 7:30 p.m., defendant told Barney Hernandez that he had seen April Holley out walking by herself. Defendant left after a few minutes, but then returned about an hour later. He and Robert Hernandez took some tires upstairs and then defendant ate. While he was eating, he told Barney Hernandez that he had gone to the Holley residence and that April was there alone. Defendant also asked Robert Hernandez to inject him with cocaine. As defendant was leaving, Barney Hernandez told him to tell the Marshalls that April was by herself. Defendant said "he was gonna check her out, and he was gonna take care of it." This conversation occurred about 9:10 p.m.

Between 9:00 and 9:30 p.m., several individuals who lived near the Holley residence heard screams coming from the direction of that residence. One of them, an 11-year-old boy named Jeremy Johnson who knew April, testified that it was April who screamed. Two other witnesses testified the screams were those of a young girl.

About 11:00 p.m., defendant appeared at the bus that served as Jimmy Rousanvall's residence. The bus was parked behind Rousanvall's father's house.[5] Rousanvall and his friend, 17-year-old Tammy Petrea, were watching television when defendant arrived. Petrea was an admitted drug addict and prostitute. Defendant asked whether they wanted to use cocaine and Petrea said yes. Rousanvall left and went into his father's house, leaving defendant alone with Petrea. After defendant and Petrea shared defendant's cocaine, defendant made a pass at her by putting his hand on her leg. Petrea, however, was frightened by defendant, who looked "scary," and she went outside. Defendant followed her and asked her whether she had heard about April being killed. Petrea said she had not. Defendant said that "they did it." He told her that April "had something on him, and he didn't want her to get on the witness stand and testify against them . . . [b]ecause then he'd go to jail or something like that." He told her that he "f—ked her, and he drowned her . . . [i]n the bathtub." He told her that he plugged the bathtub with a rag

---

[5] The distance between Rousanvall's bus and the Holley residence was 1,059 feet, or about six minutes away on foot.

and then drowned her. Defendant told Petrea that "if [she] told anybody, that he'd take care of [her], or someone else will." Petrea was frightened by the threat. Then, as he was leaving, defendant also told her that "[p]ayback was a motherf—ker."[6] Initially, Petrea did not tell police about defendant's statement because she was afraid.

Johnny Donald, who was walking in the vicinity of the Holley residence about 11:30 p.m., testified that he saw defendant and another man, who fit the description of Steven Brown, out walking, though not together, in that area.

Bobby Joe Marshall, Jr., testified that, after an evening of driving around and using drugs with his friend Joe Mills, and Steven Brown, he and Mills returned to the Marshall residence about 2:00 a.m. According to Marshall, defendant called him into the bedroom where he was sleeping and told Marshall that he had raped and killed April Holley. Defendant then warned him not to say anything to anyone.[7]

### 3. The Events of December 4

#### a. The Discovery of April Holley's Body

On the morning of Sunday, December 4, Orville Bailey and Roger Rummerfield—who lived with Bailey's daughter at Bailey's house—went to the site of a burned down house that Bailey owned to tear it down. About noon, Rummerfield, who was a friend of Naomi Holley's, went to the Holley residence to use the bathroom. Finding the front door padlocked, he went around to the back door and entered the residence. After calling out and getting no response, he went toward the bathroom. The bathroom door was

---

[6] Rousanvall's testimony from the first trial was read into evidence as part of defendant's case. He corroborated Petrea's account of defendant's arrival at the bus and that he left when defendant and Petrea began to use drugs. He testified further that when he returned, defendant was exiting the bus and Petrea was behind him. Rousanvall was also confronted with a statement he made to police in which he said defendant had arrived between 8:00 and 8:30 p.m.

[7] After defendant's arrest, Marshall himself was arrested and charged with various offenses in connection with April Holley's murder. It was at that point he told police that defendant had confessed to him. The charges were dismissed. Nonetheless, even the prosecutor did not believe the account that Marshall gave at defendant's trial of his whereabouts and activities. Rather, the prosecutor told the jury that he believed Marshall was present when defendant and Brown killed April Holley, and that the significance of Marshall's testimony was that he was the connecting link between Brown—whom he said he had been with that evening—and defendant. In support of its claim that Marshall was present at the murder, the prosecution presented evidence that Marshall told a woman named Vicky Lopez that, defendant, Marshall, and a third person were at the crime scene when "everything happened." He told her all of them had "f—ked" the victim and that, afterwards, he got rid of the shoes he wore to eliminate any shoe print matches.

cracked open. Rummerfield entered and found April lying in the bathtub. April's head was beneath the spout at the drain end of the tub and she was in a fetal position, with her right hand between her legs and her left hand behind her back. She wore only a long white sweatshirt.

Her face was partly covered with water. She had no pulse. Rummerfield ran out of the house toward Bailey and yelled at him to call an ambulance because "something's happened to April." Rummerfield also asked the Holleys' next door neighbors to call a paramedic and then went back to the Holley residence and kicked in the front door to give the paramedics access.

Bailey, meanwhile, went to a number of houses to look for a phone. He spoke to Mrs. Gore, who directed him to a blue house, but when he got there and asked to use the phone, a young man told him it had been taken care of. Bailey then went into the Holley residence. He saw April and was able to confirm Rummerfield's description of her.[8]

Paramedic Miguel Hernandez and his partner, Kathy Wojtasiewicz, were the first emergency personnel on the scene, arriving about 12:45 p.m. in response to a call about a possible drowning. At the Holley residence, Rummerfield told Hernandez, "she's dead," and led him into the bathroom. Hernandez saw that April was "in somewhat of a fetal position" with her face facing the back wall and her chest toward the bottom of the bathtub. The right side of her face was half covered in water. Hernandez estimated there were four to six inches of water in the tub.[9] Hernandez lifted April's body from the bathtub and laid her on the kitchen floor. Both he and his partner observed blood around the area of April's buttocks and discussed whether she had been sexually assaulted, but did not discuss it with any civilians.

Members of the volunteer fire department and the Tulare County Sheriff's Department also arrived on the scene. Sergeant Harold Jones of the sheriff's department arrived about 2:00 p.m. Based on his observations of the blood around April's buttocks, he discussed with other officers whether she may have been sodomized, but none of the officers discussed this possibility with any civilians. Indeed, it was the policy of the sheriff's department not to release any information to civilians about an investigation.

Dr. Gary Walter, a pathologist, arrived at the Holley residence in the midafternoon. Because of April's submersion in the bathtub, Dr. Walter was

---

[8] The defense presented evidence that four people besides Rummerfield and Bailey entered the Holley residence before the paramedics arrived and saw April. However, none of these people touched the body, nor did they know April had been sexually assaulted, nor did they discuss what they observed with anyone on that day.

[9] Various other estimates of the amount of water in the bathtub were given at defendant's trial, ranging from three inches to six inches.

unable to determine the time of death using body core temperature. Similarly, because the use of rigor mortis to determine time of death is temperature dependent, he was unable to use rigor mortis to establish time of death with any precision. In response to a hypothetical question from the prosecutor, Dr. Walter testified that the presence of rigor mortis was consistent with the murder's having occurred around 9:00 p.m. the previous evening. He also testified, however, that April could have been murdered at any time from 24 to three hours before he examined her. Dr. Walter was unable to determine whether April had been sexually assaulted and he conveyed that opinion to the police at the scene.

An autopsy performed on April's body the Monday after her murder revealed injuries to her anus and vagina consistent with rape and sodomy; these acts were perpetrated on her while she was alive. Dr. McCann, a pediatrician with a subspecialty in childhood sexual abuse, who attended the autopsy, opined that it was unlikely the sexual assault was committed by a single individual. Dr. Leonard Miller, the pathologist who performed the autopsy, opined, based on the injuries he observed, that April was forcibly drowned by "[s]omeone . . . holding this individual down, presumably underneath water," in the bathtub. Based on the presence of petechiae—small blood vessels that have ruptured—on April's face and around her eyes and eyelids, Dr. McCann opined that she had struggled violently as she was being drowned. McCann, observed, however that there were no signs of injuries to her legs or feet that might have been expected if she were struggling. Dr. Miller also observed that the absence of roughening of the skin of her lower legs indicated that they may not have been immersed in water.

### b. *Defendant's Movements on December 4*

On Sunday morning, December 4, between 9:30 and 10:00 a.m., Kim Fleeman arrived at the Marshall residence to give her cousin, Nancy Lee Marshall, a ride into town. Once there, she went to use the bathroom, walking past the room that defendant occupied. She saw defendant and Bobby Joe Marshall, Jr., in the bedroom and heard a voice she recognized as Steven Brown, who was her sister's boyfriend. Bobby Joe Marshall, Jr., said, "we've gotta get our stories straight." Defendant said, "Where are we gonna say we were the rest of the night?" She also heard Brown say, "The little bitch deserved everything she got." While she was in the bathroom, the bedroom door was shut and she was unable to hear what else was said.

Barney Hernandez saw defendant around 8:00 that morning and noticed he had blood on his shirt and that he had shaved his goatee. Defendant left after unsuccessfully attempting to call someone in Oakland. Hernandez saw defendant again around 11:00 a.m. when he gave defendant a ride. Defendant told him that he was leaving town and going to Oakland.

Sometime after noon, defendant appeared at the bus where Jimmy Rousanvall lived. There were a number of people present, including Karen Gore and Martha Delgado. Karen Gore testified that defendant said April had been found in the bathtub and had drowned. Martha Delgado testified that defendant said Roger Rummerfield had told him that April had been raped and killed. Rummerfield, however, did not see or speak to defendant that day. Delgado asked him why he was not at the Holley residence and he said "he didn't think the cops would want him down there." When she asked, "why not," he said, "I just don't think they'd want me down there, so I just left."

Rafael del Real testified that he saw defendant sometime between 1:00 and 1:30 p.m. in the vicinity of the Holley residence. According to del Real, defendant looked back and forth nervously at the Holley residence. His behavior was odd enough that del Real said to the friend he was with, "Hey, look, what if it was that guy. Look, he looks scared."

Sometime between 3:00 and 4:00 p.m., defendant's friend Brian Pounds came to the Marshall residence looking for defendant, but defendant was not there. Pounds returned that evening, when defendant was present, and defendant packed some clothes and left with Pounds to go to San Leandro.

### 4. The Ensuing Investigation

#### a. April's Drawings and Defendant's Statements About the Murder

On December 7, police recovered the drawings April had made for defendant—and which Naomi Holley said she saw at her residence on the day April was murdered—from defendant's bedroom at the Marshall residence. On Friday, December 9, while defendant was in San Leandro or Hayward, he talked to an acquaintance named Pamela Anderson. Defendant told her that a little girl he knew had been raped and killed. He told her that "they broke her arm," and "that her vagina was so mutilated, you couldn't tell she had one." Defendant told her that the girl "was put in the bathtub, or strangled and drowned in the bathtub." He also told her the girl was supposed to have spent the night at a friend's house but "something had [gone] wrong and she came home." He did not tell her that he had been speaking to people in Tulare about the crime. He did say, however, that "the police would be looking for him . . . because he was there that day, and because of his past history, his background . . . but he said that he didn't do it."

#### b. Defendant's Statements to Police

On December 11, a week after April's murder, two members of the Tulare County Sheriff's Department, Lieutenant Gary Harris and Sergeant Harold

Jones, interviewed defendant in the parking lot of a Denny's restaurant in San Leandro.[10] Defendant was advised of, and waived, his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]) (*Miranda*) and appeared alert, responsive, and eager to cooperate. He was not under arrest. The interview was conducted in the backseat of an unmarked police car. The interview was taped and the tape was played at defendant's trial.

Initially, defendant told police that on the night of Saturday, December 3, he went into the City of Tulare to pay off debts he owed to someone named Steve and then he went riding around in a brown Monte Carlo that he borrowed from someone named Steve Lynch. He did not see April Holley that night but he acknowledged that he knew her because of his friendship with her sister, Tammy. The last time he had been at the Holley residence was a week before the murder, when April had drawn him pictures which he left at the Marshalls' residence. Later in the interview he said that, after he left Tulare, he had called the Marshalls specifically to make sure that the drawings were still in his room.

Defendant said he heard about April's death from someone named Tanya, whose last name and age he could not remember. She did not provide any details, nor were any details provided by a second person named Harvey who confirmed the news. A little later in the interview he said he had heard from Bob Marshall that April was found dead in the bathtub and from a "couple of people" that she was strangled and drowned. He told the officers he had not gone to the Holley residence on Saturday night.

Defendant told the police that he did not expect Brian Pounds and Donald Pounds when they turned up at the Marshalls' residence on Sunday evening and asked him to come with them. He said he was "like part of their family [and] me and Brian are like blood brothers." He later said he wanted to return to Tulare County because he had left behind some of his clothes.

Under further questioning, defendant changed his story regarding his whereabouts on Saturday night. He admitted lying about riding around in a brown Monte Carlo, and instead told the police he had been out selling drugs with a man named Robert Cinsenio. Defendant said Cinsenio picked him up and they drove to different towns and cities in Kings County. Defendant said

---

[10] Before going to San Leandro to interview defendant, Tulare County deputies obtained a warrant for his arrest based on his alleged failure to update his sexual offender registration by providing a change of address when he moved from the City of Tulare to the Marshalls' residence in Tulare County. The purpose of obtaining the arrest warrant was to allow the police to arrest defendant in San Leandro if that became necessary, but the police decided to wait until defendant returned to Tulare County to arrest him.

he had no phone number for Cinsenio for the officers to verify his alibi. Defendant volunteered his opinion that whoever killed April was "a sick mother f—ker," and, having just been paroled out of San Quentin, he hated "a child molester." He added, "I love kids. Always have."

Following this first interview, defendant agreed to return to Tulare to answer more questions. Once he arrived there, on Monday, December 12, he was arrested on the misdemeanor arrest warrant for violating the sex offender registration statute. Defendant became angry until it was explained to him that he was not being arrested for April's murder. That afternoon he agreed to a second interview because he wanted to explain some of his earlier statements.

In his second interview, defendant retracted his statement that he had not seen April the day she was killed. He told police he had seen her with Bobby Joe Marshall, Jr., that afternoon and she waved at him. After the police falsely told defendant that someone had seen him at the Holley residence on Saturday night, defendant admitted he had gone up to the door that night and knocked but left when no one answered. After police falsely told him that he had been seen exiting the back door of the Holley residence, he said he was "loaded on cocaine when I went over there," and was looking for Tammy Holley but left after he heard a noise like a window being broken and heavy breathing. When police confronted him with Barney Hernandez's statement that defendant had told him he knew April was alone, defendant, after first denying having made the statement, admitted he had talked to April when he had gone looking for her sister. "April, she told me Tammy wasn't there, Tammy was in jail, uh, didn't know where her mom was." Defendant said he had told her she should not be alone and walked out the back door. Defendant also admitted having told Hernandez that he knew April was alone. He then said, contradicting his earlier accounts of how he had spent Saturday night, that, after leaving the Hernandez residence he went back to the Marshalls' residence, watched television and went to sleep.

The police then falsely told defendant that his semen had been found in April. Defendant denied it was his and after an angry exchange said, "I was there . . . . But I didn't kill that little girl." Defendant said that April was already dead and in the bathtub when he saw her. Defendant said he saw a man running out of the Holley residence, and then he went inside and saw April in the bathtub. A moment later he retracted his statement that he had been inside the residence.

The police then asked defendant why he had told one of them the day before that he had never thought of sodomizing little girls. Defendant said, "I don't know, just some[thing] of mine that came out . . . I don't know, why,

was April sodomized?" The police then asked him how he knew April had been strangled because no one had that information. Defendant then said, "how did I know, well, I did it? Alright, I did it. Come on, I'm saying that I did it . . . You know what, I didn't do it. I'm not saying I did it. I'm not saying nothing." Defendant repeatedly denied he had killed April. He also retracted his statement that he had seen her in the bathtub and denied that he had taken the drawings she had made for him from the Holley residence the night she was killed. Defendant then began to request a lawyer, the interview was terminated, and he was arrested for April's murder.

### c. *Physical Evidence*

DNA in semen found on a rectal slide taken from April was found to be consistent with Steven Brown's DNA. Various hair samples were collected from the crime scene. Two separate experts in hair analysis, Steven O'Clair and Charles Morton, analyzed the samples for the prosecution. O'Clair testified that three pubic hairs found in the bathtub were consistent with samples of defendant's hairs. Morton agreed that two of the three pubic hairs were consistent with defendant's hair, as was a third pubic hair found on April's sweatshirt.

### d. *Postarrest Evidence*

On Christmas Day, 1988, David Jurkovich, an inmate at Tulare County jail approached defendant and told him that "if you did that to that little girl," then "you have no God because no God will have you." Defendant replied, "she wasn't the first and she won't be the last, motherf—ker."

Evidence was also presented that in May, 1990, Steven Brown entered the home of 74-year-old Margaret A. while she was asleep and sexually assaulted and attempted to drown her. She survived.

### 5. *Defendant's Guilt Phase Evidence*

The defense consisted of impeaching the statements of prosecution witnesses as to the details of their testimony and their credibility. Additionally, defendant presented evidence to support the defense theory that Steven Brown acted alone in sexually assaulting and killing April Holley, although possibly in the presence of Bobby Joe Marshall, Jr. For example, the defense presented several witnesses who testified that Marshall and Brown were together the night that April was killed. The defense also sought to establish that April was not killed around 9:30 p.m. on Saturday night, as the prosecution claimed, but in the early morning hours of Sunday, December 4. The defense also presented evidence that there were numerous people inside and outside of the Holley residence on Sunday morning who might have

speculated or gossiped about the circumstances of April's death, to counter prosecution evidence that no details were released to the public. The defense also produced testimony to support its claim that Donald and Brian Pounds had planned to come to Tulare two or three days before December 4, to counter prosecution evidence that they had come that day specifically to take defendant with them. The defense also presented its own hair analysis expert, Stephan Schliebe, who disputed testimony from the prosecution experts that pubic hairs removed from the bathtub and April's sweater were consistent with defendant's hair. A second defense expert, Peter Barnett, also testified to this effect.

### B. Penalty Phase Evidence

#### 1. Prosecution Evidence

Gina I. testified that in 1982, when she was 16 years old, defendant, along with Donald Pounds and Brian Pounds, raped her at a party at Donald Pounds's residence. She testified that, after Donald Pounds raped her, defendant came into the room and said "those guys told me that you said I was a faggot, and I'm gonna prove to you I'm not." He struck her and as he raped her he said, "f—k you, c—t, I hate all you women," and "you're a bitch, you all get what you deserve, and I'm not a faggot." Defendant pled guilty to forcible rape in 1982.

Michael M. testified that, while he and defendant were in prison, defendant, after learning M. had been convicted of rape, forced M. to orally copulate him and then subsequently sexually assaulted him 10 to 20 times. Defendant, whom M. described as the "head white representative of the barracks," also made M. perform sexual acts on other inmates.

Julia Parnell, who dated defendant in 1984, and her son Chris O., testified that defendant once squeezed the genitals of Parnell's other son, Richard, when he was an infant because he was crying. Defendant squeezed him with such force that he required hospitalization. Michael Montejano, the police officer who investigated defendant's abuse of the infant, testified that defendant denied having injured the infant because he "loved Richard as if he was his own, and he would not abuse him, that he was not a child abuser." Defendant also told Montejano that "the person who [was] responsible would be sorry if he ever found out who did this."

#### 2. Defendant's Penalty Phase Evidence

Defendant's penalty phase evidence focused on his family history. Various family members, including two brothers, a sister, his mother, and maternal

grandmother testified that defendant was raised in an atmosphere of neglect and violence. Defendant did not live with both his parents until he was eight years old. Until then he was sometimes raised by his maternal grandparents and sometimes by his mother alone in Arkansas. At one point, defendant and his siblings were removed from his mother's custody because of her failure to provide proper care for them. In 1971, when defendant was eight, his mother moved with her children to California to rejoin defendant's father. Defendant's father was an alcoholic and he and defendant's mother sometimes got into physical fights. Defendant tried to get between his parents when they fought, but he was pushed back or hit. When defendant's father was sober he was hard on defendant. Defendant was described as a "bullheaded and stubborn" child who needed considerable attention and discipline, which he did not receive from his mother. Almost the only people able to control defendant were his maternal grandparents. However, even they were unable to handle defendant after he started using drugs.

Dr. Yosef Gershuri, a psychologist, interviewed defendant over a three- or four-hour period to assess his mental status. He testified defendant had an IQ of 73 and suffered from attention deficit disorder as well as having borderline intellectual function and associated personality disorders. Dr. Gershuri explained that attention deficit disorder is "a disorder of attention, disordered impulsivity, and a disorder of hyperactivity, being very . . . overly active." He also explained that individuals suffering from this disorder "eventually develop very aggressive behaviors towards others." Dr. Gershuri testified that a child with this disorder would have difficulties in school and, as a result, would experience derogatory assessments of his performance that would contribute to low self-esteem. In the family, such a child might be punished, but punishment would do little except to make the child more upset.

Gary Yates, a licensed marriage, family, and child counselor, reviewed interviews of defendant's family members and information about defendant's childhood, including probation reports, school records, and medical records. Based on that review, Yates testified that there were "severe family dysfunctions" in defendant's family, including his father's alcoholism, a pattern of spousal abuse, and physical neglect of defendant and his siblings. Yates testified that a father's alcoholism was the "highest predictor" for alcoholism in male children as well as for other "poor outcomes." Yates testified that defendant's exposure to his father's physical assaults on his mother, in addition to creating "school problems, truancy, [and] low self-esteem" might also correlate to the use of violence by defendant against women. Yates testified further that defendant evidenced attention deficit disorder that was undiagnosed and untreated. Children suffering with this disorder often become substance abusers in an attempt to self-medicate. Yates also testified that defendant showed signs of self-destructive behavior. Yates concluded that

defendant's adult behavior was predictable given his dysfunctional family and the unavailability of any help for him with his various problems when he was a child.

## II. ANALYSIS

### A. *Jury Selection and Pretrial Issues*

#### 1. *Prosecutor's Use of Peremptory Challenges to Excuse Death Penalty Skeptics*

Defendant contends that the prosecutor improperly used his peremptory challenges to excuse any prospective juror who expressed reservations about the death penalty and, in a related argument, that the prosecutor improperly excused prospective jurors based on their religious affiliation.

■ As a preliminary matter, defendant asserts that his "jurors were so death-primed that they could not act as the conscience of the community." Defendant does not, however, contend that the trial court erred by denying a defense challenge for cause against any of these jurors based on their views about the death penalty. (See *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844] [prospective juror may be excused for cause if his or her views on the death penalty would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath' "]; *People v. Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250] [adopting *Witt* standard].) Moreover, defense counsel accepted the panel about which defendant now complains even though the defense had not exhausted its peremptory challenges. (*People v. Cox* (1991) 53 Cal.3d 618, 648, fn. 4 [280 Cal.Rptr. 692, 809 P.2d 351] ["defense acceptance of jury without exhausting peremptory challenges is 'strong indicator[] that the jurors were fair, and that the defense itself so concluded' "], quoting *People v. Balderas* (1985) 41 Cal.3d 144, 180 [222 Cal.Rptr. 184, 711 P.2d 480].) Under these circumstances, we agree with the Attorney General that defendant's retrospective characterization of his jury as "death-primed" does not, in and of itself, raise a cognizable issue on appeal.

■ Defendant next argues that the prosecutor's use of peremptory challenges to excuse any prospective juror who expressed any reservation about the death penalty violated his constitutional right to a representative jury. As defendant concedes, we have repeatedly rejected this argument. "[W]e see no . . . constitutional infirmity in permitting peremptory challenges by both sides on the basis of specific juror attitudes on the death penalty. While a statute requiring exclusion of all jurors with any feeling against the death penalty produces a jury biased in favor of death [citation], we have no proof

that a similar bias arises, on either guilt or penalty issues, when *both parties* are allowed to exercise their equal, limited numbers of peremptory challenges . . . against jurors harboring specific attitudes they reasonably believe unfavorable." (*People v. Turner* (1984) 37 Cal.3d 302, 315 [208 Cal.Rptr. 196, 690 P.2d 669]; see *People v. Brown* (2004) 33 Cal.4th 382, 403 [15 Cal.Rptr.3d 624, 93 P.3d 244] ["The prosecution's use of peremptory challenges to remove prospective jurors who express scruples about imposing the death penalty does not violate any constitutional guarantee."].) We are unpersuaded by defendant's arguments that invite us to reconsider our analysis of this claim.

Defendant then contends that, in his effort to remove any prospective juror with reservations about the death penalty, the prosecutor systematically excluded prospective jurors based on their religious affiliation in violation of *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*). Counsel failed to make a *Wheeler* motion at trial. This omission forfeits the issue on appeal. (*People v. Bolin* (1998) 18 Cal.4th 297, 316 [75 Cal.Rptr.2d 412, 956 P.2d 374].)[11] Even if the claim were not forfeited, we would reject it on its merits.

■ "We have previously stated that religious membership constitutes an identifiable group under *Wheeler*." (*In re Freeman* (2006) 38 Cal.4th 630, 643 [42 Cal.Rptr.3d 850, 133 P.3d 1013].) " 'Such a practice [religious-based excusals] also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution.' " (*People v. Bell* (2007) 40 Cal.4th 582, 596 [54 Cal.Rptr.3d 453, 151 P.3d 292].) Here, however, the jurors were not excused based on their denominational affiliations because none of them said such affiliation would prevent them from imposing the death penalty. Thus, there is no basis in the record on which to conclude that they were excused because of their membership in a particular religious group. To the extent defendant is arguing it was improper to excuse them

---

[11] Defendant urges us not to apply any procedural bars to any of his claims but, rather, to review them on their merits because of the finality of the death penalty. We have recognized exceptions to the forfeiture doctrine with respect to certain constitutional claims raised for the first time on appeal. (See *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 1 [42 Cal.Rptr.3d 677, 133 P.3d 581] (*Boyer*); *People v. Partida* (2005) 37 Cal.4th 428, 433–439 [35 Cal.Rptr.3d 644, 122 P.3d 765].) But we have never held that forfeiture is inapplicable to an entire class of cases and we will not do so here. Therefore we will entertain constitutional claims not raised below only to the extent "the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. . . . [¶] In [this] instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none." (*Boyer, supra*, 38 Cal.4th at p. 441, fn. 17.)

because any reluctance on their part to impose the death penalty was based on their religious belief—although there is nothing in the record to indicate this was the case—he is wrong.

Prospective Juror P.B. specifically told the court that she had no religious beliefs that would interfere with her ability to reach a judgment. In response to defense questioning, she reaffirmed the observation she made in her juror questionnaire that there are biblical accounts of imposing the death penalty and, in response to her feelings about the death penalty, stated, "I think it's based on an individual basis, and I don't think that currently I could say one way or the other how a decision should be made at this point."

Prospective Juror R.J., an Episcopal priest, while stating that he preferred not to sit on a death penalty case, said he could vote for the death penalty if he believed it was warranted, although this would be "extremely difficult." Nowhere, however, did he state that his membership in the Episcopal Church would prevent him from imposing the death penalty. Indeed, in response to a prosecution question, he said that even if his church was opposed to the death penalty, that position "really wouldn't affect me" because of the structure of the church. Moreover, his greatest concern was that the unexpected departure of his assistant had left him short-handed.

Prospective Juror J.C. identified himself as a Catholic but said, notwithstanding his church's opposition to the death penalty, he could impose the death penalty "[i]f that is the law." Prospective Juror W.D. noted on his juror questionnaire that his religious organization did not consider the death penalty a solution, but also stated he did not feel an obligation to accept that view. W.D. stated that, notwithstanding his church's position on the death penalty, he could vote for the death penalty in the appropriate case.

Clearly, none of these prospective jurors took the position that their religious affiliations would prevent them from imposing the death penalty. Thus, we are not persuaded by defendant's claim that their religious affiliations were the basis of the peremptory challenges. And even if their ambivalence toward the death penalty had some basis in their religious views, "[e]xcusing prospective jurors who have a religious bent or bias that would make it difficult for them to impose the death penalty is a proper, nondiscriminatory ground for a peremptory challenge." (*People v. Cash* (2002) 28 Cal.4th 703, 725 [122 Cal.Rptr.2d 545, 50 P.3d 332].)

### 2. *Excusal of Prospective Jurors for Cause*

Defendant contends that the trial court's excusal for cause of eight prospective jurors who stated unequivocally they could not impose the death

penalty violated his right to a representative jury because the court's questioning was inadequate. Alternatively, he contends that the elimination of any prospective juror who would not impose the death penalty denied him an impartial jury drawn from a fair cross-section of the community.

■ "A prospective juror may be challenged for cause based upon his or her views regarding capital punishment only if those views would ' "prevent or substantially impair" ' the performance of the juror's duties as defined by the court's instructions and the juror's oath. [Citations.] ' " 'A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate.' [Citation.]" [Citation.] In addition, " '[o]n appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous.' [Citations.]" ' [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 975 [108 Cal.Rptr.2d 291, 25 P.3d 519].)

Six of the eight prospective jurors to whom defendant refers stated on their juror questionnaires that they would always vote against death while a seventh, I.R., stated that he was compelled to follow his church's teaching "not to kill another human being." In response to questioning by the court, each of these jurors confirmed that they would not impose the death penalty under any circumstance. The eighth prospective juror, E.I., gave equivocal answers on her questionnaire about whether she could impose the death penalty but, during extensive questioning by the court, indicated that stress caused her stomach problems that made her "have to go to the restroom a lot." She indicated further that, notwithstanding her belief in the death penalty, she didn't "know if [she] could condemn somebody to death," and "I don't know if I could live with myself if I did that." In further colloquy, she told the court she believed she was "too emotional" to make the decision whether to impose death and being faced with the decision would aggravate her "nervous stomach." The court excused her on the ground that her "opinions and feelings would substantially impair her ability to be fair in this case."

Although defendant criticizes the adequacy of the court's questioning, he does not point to specific deficiencies. On this record, we conclude that the trial court's questioning was adequate and that the court properly excused these prospective jurors for cause. Thus, this case is quite different from the cases on which defendant relies, in which one trial court improperly excused five jurors based solely on their juror questionnaire answers (*People v. Stewart* (2004) 33 Cal.4th 425, 445 [15 Cal.Rptr.3d 656, 93 P.3d 271]), and another court improperly excused a prospective juror even after the prospective juror

indicated he would not automatically vote for life without possibility of parole, rather than impose death, no matter what the evidence showed (*People v. Heard* (2003) 31 Cal.4th 946, 963–966 [4 Cal.Rptr.3d 131, 75 P.3d 53]).

█ We have repeatedly rejected defendant's alternative claim, concluding that "[t]he exclusion of those categorically opposed to the death penalty at the guilt phase of the trial does not offend either the United States Constitution [citation] or the California Constitution [citation]. As the United States Supreme Court explained, death penalty opponents, 'or for that matter any other group defined solely in terms of shared attitudes that render members of the group unable to serve as jurors in a particular case, may be excluded from jury service without contravening any of the basic objectives of the fair-cross-section requirement.' [Citations.] It is also well settled that this exclusion does not violate defendant's right to an impartial jury." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1198 [56 Cal.Rptr.2d 49, 920 P.2d 1254], quoting *Lockhart v. McCree* (1986) 476 U.S. 162, 176–177 [90 L.Ed.2d 137, 106 S.Ct. 1758]; see *People v. Lenart* (2004) 32 Cal.4th 1107, 1120 [12 Cal.Rptr.3d 592, 88 P.3d 498]; *People v. Steele* (2002) 27 Cal.4th 1230, 1243 [120 Cal.Rptr.2d 432, 47 P.3d 225]; *People v. Catlin* (2001) 26 Cal.4th 81, 112 [109 Cal.Rptr.2d 31, 26 P.3d 357].) As in those cases, "[d]efendant here has likewise failed to make a compelling case for us to revisit this issue." (*People v. Lenart, supra,* 32 Cal.4th at p. 1120.)

### 3. *Denial of Defense Challenge for Cause*

Defendant contends that the trial court erroneously refused to excuse for cause Prospective Juror E.M., whom he claims gave answers on her jury questionnaire, and in response to the court's examination, that revealed she would automatically vote for the death penalty. Following the court's refusal to excuse E.M., defendant used a peremptory challenge to excuse her. Defendant did not, however, exhaust his peremptory challenges.

Defendant's claim fails for the simple reason that, even assuming E.M. was biased, she did not serve on the jury and therefore "could [not] possibly have affected the jury's fairness . . . ." (*People v. Yeoman* (2003) 31 Cal.4th 93, 114 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) As we further explained in *Yeoman*, "[a]n erroneous ruling that forces a defendant to use a peremptory challenge, and thus leaves him unable to exclude a juror who actually sits on his case, provides grounds for reversal only if the defendant '*can actually show that his right to an impartial jury was affected* . . . .' [Citation.] In other words, the loss of a peremptory challenge in this manner ' "provides grounds for reversal only if the defendant exhausts all peremptory challenges *and an incompetent juror is forced upon him.*" ' [Citations.]" (*Ibid.*) Here, where

defendant did not exhaust all his peremptory challenges, he cannot even begin to demonstrate that his right to an impartial jury was impaired by the trial court's refusal to excuse E.M. for cause, even assuming this was error. Defendant spills considerable ink urging that we not apply this principle to his claim but his arguments are not persuasive.

### 4. *Suppression of Defendant's Postarrest Statement to Police*

#### a. *Illegality of Defendant's Arrest*

Defendant contends that his arrest was illegal because the affidavit submitted in support of the arrest warrant designated the wrong subdivision of section 290 as the offense for which his arrest was sought. He argues therefore that his postarrest statement should have been suppressed. We disagree.

Because of his 1982 conviction for forcible rape, defendant was required to register as a sex offender under section 290. The police report, incorporated by reference into the affidavit seeking an arrest warrant, cited both section "290(a) PC" and "fail[ure] to comply with 290 PC." The body of the report stated that the investigating officer, Deputy Pinon, had ascertained from the Tulare Police Department that defendant had registered with that agency on November 24, 1986, at an address on West Merrit in the City of Tulare. As of September 1988, however, he had moved and was living on Canal Street in an unincorporated area of Tulare County. Pinon sought the warrant based on defendant's failure to register with the sheriff's department upon taking up residence in the county.

■ Section 290, subdivision (a), as it existed in 1988, set forth the general requirement that individuals required to register as sex offenders shall "within 14 days of coming into any county or city . . . in which he or she temporarily resides or is domiciled for that length of time register with the chief of police of the city in which he or she is domiciled or the sheriff of the county if he or she is domiciled in an unincorporated area." (Stats. 1987, ch. 1418, § 3.1, pp. 5225–5228.) Section 290, former subdivision (f) provided that if a person required to register changed his or her address "the person shall inform, in writing within 10 days, the law enforcement agency with whom he or she last registered of the new address." Defendant argues that, in essence, he had no obligation to register with the sheriff's department upon moving to Canal Street, under subdivision (a), and that the only former section 290 offense he could have been arrested for in 1988 was under subdivision (f), based on his failure to notify the Tulare Police Department of his change of address. He reasons that because Pinon's report did not establish probable

cause to support his commission of that offense, the affidavit was fatally defective and the resulting arrest warrant invalid.[12]

██ "Probable cause to issue an arrest or search warrant must . . . be based on information contained in an affidavit providing a substantial basis from which the magistrate can reasonably conclude there is a fair probability that a person has committed a crime or a place contains contraband or evidence of a crime." (*Bailey v. Superior Court* (1992) 11 Cal.App.4th 1107, 1111 [15 Cal.Rptr.2d 17].) As to the sufficiency of the affidavits, such "affidavits 'are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area.' [Citation.]" (*Illinois v. Gates* (1982) 462 U.S. 213, 235 [76 L.Ed.2d 527, 103 S.Ct. 2317].) "Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police. However, where these circumstances are detailed . . . and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense manner. . . . [T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." (*United States v. Ventresca* (1965) 380 U.S. 102, 109 [13 L.Ed.2d 684, 85 S.Ct. 741].) Furthermore, "[i]n cases where an officer had in mind facts which justified an arrest, and made an arrest upon those facts, the arrests have been held lawful despite the officer's having cited some other closely related offense at the time of arrest or in testifying." (*People v. Howell* (1973) 30 Cal.App.3d 228, 235 [105 Cal.Rptr. 748].)

Applying these principles, we reject defendant's claim for the following reasons. First, defendant provides no authority—nor has our research revealed any—to support his claim that a registrant who moved from one jurisdiction into another was not required both to report his change of address with the law enforcement agency in the old jurisdiction and to register with law enforcement in the new jurisdiction, even under section 290 as it existed in 1988. Nor is such a construction of the statute plausible because it would have left law enforcement in the new jurisdiction unaware that a sex offender had moved into the community. This would have been fundamentally incon- sistent with the longstanding purpose of section 290 " ' " 'to assure that persons convicted of the crimes enumerated therein shall be readily available for police surveillance at all times because the Legislature deemed them

---

[12] The current version of section 290, subdivision (a) makes it clear that those subject to the registration requirement must, upon changing their address, register with the law enforcement agency having jurisdiction over the area to which they have removed themselves and also notify the law enforcement agency with whom they had been registered of their new address. (§ 290, subds. (a)(1)(A), (f)(1); *People v. Musovich* (2006) 138 Cal.App.4th 983, 988 [42 Cal.Rptr.3d 62].)

likely to commit similar offenses in the future.' " ' " (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1196 [39 Cal.Rptr.3d 821, 129 P.3d 29].) Thus, it is not at all clear that the affidavit did not correctly describe a violation of section 290, subdivision (a).

Second, it is also not clear that the affidavit did not adequately describe a violation of section 290, former subdivision (f). The police report filed in connection with the affidavit related (1) that the affiant officer had "checked with the Tulare P[olice] D[epartment] and found that [defendant] had registered with Tulare Police Dept. [on] November 24, 1986" at "1781 W. Merrit, Tulare," and (2) that, as of September 1988, defendant was living with the Marshall family on Canal Street in an unincorporated area of Tulare County. A teletype attached to the affidavit also confirmed that defendant had registered with the Tulare Police Department in 1986, but did not show that he had registered his change of address with any law enforcement agency. It can be inferred from these facts that defendant had failed to notify the Tulare Police Department of his change of address in 1988, thus violating section 290, former subdivision (f).

Third, even assuming that the affiant officer designated the wrong subdivision of section 290, there is no question that interpreting the affidavit in a commonsense manner, as opposed to defendant's hypertechnical reading, supports the magistrate's finding that there was probable cause to believe defendant had violated some provision of section 290. The misdesignation may have provided defendant a defense at trial (cf. *People v. McCleod* (1997) 55 Cal.App.4th 1205, 1209, fn. 1 [64 Cal.Rptr.2d 545]), but it does not obviate probable cause for the purpose of the issuance of the arrest warrant.

> b. *Delay in Defendant's Arraignment on the Misdemeanor Charge*

Defendant also contends that his postarrest statement should have been suppressed because the police violated section 825 by unnecessarily delaying his arraignment on the misdemeanor section 290 charge. We reject his claim.

■ At the time of defendant's arrest, section 825, as relevant, provided: "The defendant must in all cases be taken before the magistrate without unnecessary delay, and, in any event, within two days after his arrest, excluding Sundays and holidays . . . ." (As amended by Stats. 1961, ch. 2209, § 1, p. 4554.) "Of course, section 825 does not 'authorize a two-day detention in all cases. Instead, "a limit [is placed] upon what may be considered a necessary delay, and a detention of less than two days, if unreasonable under the circumstances, is in violation of the statute" and of the Constitution.' " (*People v. Turner* (1994) 8 Cal.4th 137, 175 [32 Cal.Rptr.2d 762, 878 P.2d

521].) Nonetheless, "[t]o justify exclusion of a statement, defendant must show that the delay produced his admissions or that there was an essential connection between the illegal detention and admissions of guilt." (*Id.* at p. 176; see *People v. Sapp* (2003) 31 Cal.4th 240, 270 [2 Cal.Rptr.3d 554, 73 P.3d 433] ["delay in arraignment would justify suppressing a confession only upon a defendant's showing that the confession was the *product* of an illegal detention"].)

Here, the evidence produced at defendant's motion to suppress his statement demonstrated that he was arraigned within two days of his arrest and, further, at his own request was not arraigned the day after his arrest. Defendant was arrested on the misdemeanor section 290 charge about 11:40 p.m. on Sunday, December 11, 1988, and arraigned on that charge in the early afternoon of Tuesday, December 13, 1988. The reason he was not arraigned on Monday, December 12, was because he wanted to rest in order to take a second polygraph examination regarding his involvement in the Holley murder after the first test proved inconclusive because he was fatigued.

On this record it is clear that defendant was arraigned on the misdemeanor charge within the two-day outer limit set forth in section 825 and that the failure to have arraigned him on the day after his arrest did not constitute unnecessary delay because it was at his request. (See *People v. Thompson* (1980) 27 Cal.3d 303, 328, 330 [165 Cal.Rptr. 289, 611 P.2d 883] [where defendant was arrested on Sunday night and not arraigned until Tuesday, and the purpose for the delay was to allow defendant and arresting officer to sleep, "even if section 825 were violated, that would not render [defendant's] confession inadmissible"].)[13] Thus, this case is distinguishable from *People v. Jenkins* (2004) 122 Cal.App.4th 1160 [19 Cal.Rptr.3d 386], cited by defendant, because in *Jenkins* the delay in arraignment on a misdemeanor arrest was "used solely to question defendant" about the offenses for which he was ultimately convicted, first degree murder and attempted murder. (*Id.* at pp. 1175–1176.) Moreover, "even if a confession occurs during a period of illegal detention under section 825, that fact does not render it inadmissible. A delay in arraignment is treated 'as only one of the factors to be considered in determining whether the statement was voluntarily made.' " (*People v. Thompson, supra,* 27 Cal.3d at p. 329.) Other than the bare fact that defendant made the challenged statement before he was arraigned, defendant points us to nothing in the record that demonstrates a connection between the claimed illegal delay and the statement that would justify suppression.

---

[13] Thus, because any delay was not for purposes of eliciting incriminating statements, there was no federal constitutional violation. (*County of Riverside v. McLaughlin* (1991) 500 U.S. 44, 56 [114 L.Ed.2d 49, 111 S.Ct. 1661] [delay of less than presumptively prompt 48 hours may violate 4th Amend. if delay was for improper purpose].)

## c. *Voluntariness*

Lastly, defendant contends his postarrest statement should have been excluded because it was involuntary. Defendant deploys a number of arguments in support of this claim, among them that his statement was the result of police deception, that the questioning was overly aggressive, that his low IQ made him particularly vulnerable to the questioning, and a suggestion that his statement was obtained in violation of *Miranda.* Based on our review of defendant's statement, we conclude that neither singularly nor collectively are these claims persuasive.

After defendant was interviewed in San Leandro on December 10, he voluntarily agreed to return to Tulare County the following day. When he arrived, on Sunday, December 11, he was arrested on the misdemeanor arrest warrant and became angry until it was explained to him that he was not being arrested for the Holley murder. Defendant requested a polygraph examination that evening. He was re-advised of his rights, waived them, and the polygraph examination was administered. The results of the first examination were inconclusive and defendant requested a second one. He also wanted to rest before it was administered, so he was placed in an area of the jail where "he could get plenty of sleep and not be bothered." The second polygraph was administered in the early afternoon. He was then interrogated that afternoon in the office of the violent crimes unit beginning about 3:55 p.m. He was again advised of, and waived, his rights, before the interrogation. The interrogation lasted about an hour and 40 minutes. During the course of the interview, as defendant shifted and changed his story, he became agitated, "put[ting] his forehead down on the desk and . . . whining and moaning," "jump[ing] up, and . . . rant[ing] and rav[ing.]" At the end of the questioning he "suddenly jumped up," and tried to kick Lieutenant Harris. Defendant, however, was restrained by leg irons and a "belly chain." During the course of the interrogation, the police gave him false information, telling him, for example, that witnesses had seen him leaving the Holley residence the night of the murder and that his semen had been found in the victim. When defendant requested a lawyer, the interrogation was ended.

■ "A statement is involuntary when 'among other circumstances, it "was ' "extracted by any sort of threats . . . , [or] obtained by any direct or implied promises, however slight . . . ." ' " [Citations.] Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the "totality of [the] circumstances." ' (*People v. Neal* (2003) 31 Cal.4th 63, 79 [1 Cal.Rptr.3d 650, 72 P.3d 280].) . . . [¶] 'In reviewing the trial court's determinations of voluntariness, we apply an independent standard of review, doing so "in light of the record in its entirety, including 'all the surrounding circumstances—both the characteristics of the accused and the details of the

[encounter].' " ' (*People v. Neal, supra*, 31 Cal.4th at p. 80.) But ' "we accept the trial court's factual findings, based on its resolution of factual disputes, its choices among conflicting inferences, and its evaluations of witness credibility, provided that these findings are supported by substantial evidence." [Citation.]' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 813–814 [38 Cal.Rptr.3d 98, 126 P.3d 938].)

Applying these principles, we reject defendant's argument that police deception rendered his statement involuntary. " 'Lies told by the police to a suspect under questioning can affect the voluntariness of an ensuing confession, but they are not per se sufficient to make it involuntary.' " (*People v. Farnam* (2002) 28 Cal.4th 107, 182 [121 Cal.Rptr.2d 106, 47 P.3d 988].) Here, the police deceived defendant only about his having been seen by two witnesses leaving the Holley residence—which ultimately led him to admit he was in the residence, a statement he then retracted—and that his semen was found in the victim—a fact he vehemently denied. Viewing police statements under the totality of the circumstances test, we cannot say they rendered defendant's statement involuntary.

Defendant also claims that, as the interrogation progressed, the questioning became increasingly aggressive, leading him to become confused and hysterical. Our review of the transcript, however, indicates not that the police engaged in overly aggressive behavior but, rather, that defendant became increasingly agitated as he was caught in one lie after another. Defendant also asserts that his low IQ—he later tested at 73—made him especially vulnerable in the interrogation setting. The police, however, had no reason to know that defendant had a low IQ, nor do his responses during the interrogation indicate mental defect. (Cf. *People v. Neal, supra*, 31 Cal.4th at p. 84 ["And defendant's intelligence, *as the record reveals from beginning to end*, was quite low." (Italics added.)].) Finally, contrary to defendant's suggestion, his statement was not obtained in violation of his *Miranda* rights. Rather, the interrogation was terminated shortly after defendant requested a lawyer.

Indeed, as his invocation of his right to counsel demonstrates, and contrary to his characterization of himself as a helpless, easily confused naïf, defendant, a convicted felon, was wise in the ways of the criminal justice system, unlike the defendant in *Neal* to whom he compares himself. (*People v. Neal, supra*, 31 Cal.3d at p. 84 [noting that the 18-year-old defendant had little knowledge of the criminal justice system, minimal education, low intelligence, and was kept isolated, hungry, and incommunicado].) Accordingly, the totality of the circumstances attending defendant's statement do not support his claim that it was the involuntary product of police coercion.

### 5. *Public Defender Conflict*

Defendant contends that the trial court violated his rights to due process and to counsel when it relieved the public defenders who had represented him for 14 months because their office had represented a potential prosecution witness, notwithstanding defendant's willingness to waive any conflict of interest. Because his public defenders took the position that they would be unable to cross-examine their former client should he testify, defendant alternatively maintains the trial court should have preemptively excluded the testimony rather than relieve his counsel.

On February 9, 1990, the public defenders representing defendant, Messrs. Pereira and Cherney, informed the court of a potential conflict of interest they had discovered in reviewing the prosecution's witness list. Included on the list was Lester Smith, whom the public defender's office had represented in two felony cases from November 1988 through September 1989. Smith had been sentenced to 21 years in state prison; the public defender had unsuccessfully sought to have Smith housed out of state. The prosecution had agreed to allow Smith to be housed out of state if he testified truthfully against defendant that defendant told him he had raped and killed April Holley while Smith and defendant were housed in the Tulare County jail. Defendant had made a similar admission to another inmate, Tony Enos, before he talked to Smith. Smith had spoken to Enos.

Mr. Pereira, who had been personally involved in some aspects of his office's representation of Smith, explained to the court that based on these contacts with Smith, "I could not properly, adequately or effectively cross-examine Smith in [defendant's] case." When pressed by the court to elaborate, Pereira said that, should he cross-examine Smith, Smith might be able to invoke attorney-client privilege to not answer certain questions, or he might blurt out that the public defender had previously represented him, which would "discredit myself and Mr. Cherney" before the jury. He also explained that attacking Smith's credibility might result in Smith's not getting the benefit of his agreement with the prosecutor to be housed in an out-of-state prison and he could not do anything that would injure a former client.

The prosecutor stated that "[i]t's our intention to call Lester Smith. It's not to say we're going to call him, because you never know what's going to happen at trial. We certainly wouldn't want to be put in a position now of being precluded from calling Mr. Smith." The court and counsel explored various avenues around the conflict, including appointing a third attorney for defendant for the limited purpose of cross-examining Smith—to which the defense objected—or videotaping Smith's testimony, or requiring the prosecution to call him as one of its first five witnesses—to which the prosecution

objected. The court and counsel also discussed appointing independent counsel to advise defendant about his right to conflict-free counsel should defendant insist on being represented by the public defender.

Although the prosecutor stated that he was not requesting recusal of the public defender's office, he was concerned that permitting defendant to waive the conflict would result in a mistrial or potential reversible error. The court found this position to be unsatisfying. "[Y]ou can't have it both ways, Mr. Ferguson. You either have to tell me that you want me to recuse the Public Defender's Office because we can't get a knowing, intelligent, voluntar[y] waiver, or you want to see if we can get a knowing, intelligent and volunt[a]ry and understanding waiver." The prosecutor replied: "Our position is that they have to conflict out."

At the end of the colloquy, Mr. Pereira asked to be relieved, saying, "I cannot and no Public Defender will cross-examine Lester Smith in this case." Nonetheless, he informed the court that defendant was prepared to waive his right to a conflict-free attorney in order to keep Pereira and Cherney as his lawyers. However, he then suggested another solution—exclusion of Smith's testimony under Evidence Code section 352. The prosecution objected and the matter was continued.

Subsequently, the defense filed a written motion to exclude Smith's testimony as cumulative and more prejudicial than probative in view of its impact on the ability of the public defender to continue to represent defendant. The prosecution opposed the motion, arguing that recourse to Evidence Code section 352 to solve a conflict of interest problem was inappropriate and that Smith's testimony was not cumulative but corroborative in a case based on circumstantial evidence. The trial court denied the motion and relieved defendant's counsel. The prosecution did not call Lester Smith to the stand.

Defendant contends the trial court's ruling—denying this Evidence Code section 352 motion and relieving counsel—violated both the federal and state Constitutions. We disagree.

A trial court may remove defense counsel, even over defendant's objections, "in order to eliminate potential conflicts, ensure adequate representation, or prevent substantial impairment of court proceedings . . . ." (*People v. McKenzie* (1983) 34 Cal.3d 616, 629 [194 Cal.Rptr. 462, 668 P.2d 769].) On appeal, the trial court's removal of counsel is reviewed for abuse of discretion. " 'A court abuses its discretion when it acts unreasonably under the circumstances of the particular case.' " (*People v. Panah* (2005) 35 Cal.4th 395, 426 [25 Cal.Rptr.3d 672, 107 P.3d 790].) "Inherent in the question

whether a trial court may disqualify a criminal defense attorney over the defendant's objection is the conflict between the defendant's preference to be represented by that attorney and the court's interest in 'ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.' " (*People v. Jones* (2004) 33 Cal.4th 234, 240 [14 Cal.Rptr.3d 579, 91 P.3d 939], quoting *Wheat v. United States* (1988) 486 U.S. 153, 160 [100 L.Ed.2d 140, 108 S.Ct. 1692] (*Wheat*).)

*Jones* is instructive. There, the trial court disqualified defense counsel because his office had represented an individual whom the defense viewed as a possible third party culprit in the defendant's case, even though defense counsel had represented the defendant for two years and the defendant offered to waive the conflict. In the end, the defense did not put on evidence relating to the former client of the disqualified attorney. As here, the defendant argued on appeal that removal of counsel violated his rights under both the federal and state Constitutions.

In discussing the defendant's Sixth Amendment claim, we pointed out that "a trial court's decision whether to allow a defendant to waive a conflict of interest cannot be made after trial, but instead occurs 'in the murkier pretrial context when relationships between parties are seen through a glass, darkly.' (*Wheat, supra*, 486 U.S. at p. 162.) The [*Wheat*] court went on to say that '[t]he likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict' and are 'even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics.' " (*People v. Jones, supra*, 33 Cal.4th at p. 241.) Thus, given the potential conflict arising between defense counsel's representation of the defendant and counsel's prior representation of a potential alternative suspect, and in light of the " 'substantial latitude' " given to trial courts to eliminate potential conflicts under the *Wheat* decision, the "discharge did not violate defendant's right to counsel under the federal Constitution." (*Id.* at p. 242.)

Turning to the defendant's state constitutional claim, we observed: "The California Constitution gives a criminal defendant the right to an attorney who must competently represent the defendant. But, as we have often pointed out, the state Constitution does not give an indigent defendant the right to *select* a court-appointed attorney. . . . [¶] The *removal* of an indigent defendant's appointed counsel . . . poses a greater potential threat to the defendant's constitutional right to counsel than does the refusal to *appoint* an attorney requested by the defendant, because the removal interferes with an attorney-client relationship that has already been established. But when, as here, a trial court removes a defense attorney because of a potential conflict of interest, the court is seeking to protect the defendant's right to competent

counsel. In such circumstances, there is no violation of the right to counsel guaranteed by article I, section 15 of the state Constitution, notwithstanding the defendant's willingness to waive the potential conflict." (*People v. Jones, supra*, 33 Cal.4th at pp. 244–245.)

Similarly, in this case, the trial court's removal of defense counsel where there was no dispute as to the existence of a potential conflict should Smith testify did not violate defendant's constitutional rights. Contrary to defendant's assertion, the record reveals that the court and the parties explored alternatives that would have permitted defense counsel to continue to represent defendant, but none was satisfactory. Additionally, nothing in the record supports defendant's claim that the prosecution engineered the conflict by putting Smith's name on the witness list with no intention of calling him. The prosecutor acknowledged that Smith might not be called. This is simply an example of the difficulties of sorting through potential conflicts of interest in the murk of pretrial " 'when relationships between parties are seen through a glass, darkly.' " (*People v. Jones, supra*, 33 Cal.4th at p. 241.) There is nothing on the record to support any allegation of misconduct by the prosecutor and no amount of invective by defendant can compensate for that deficiency. The trial court did not violate defendant's right to counsel in this case.

Nor did the trial court abuse its considerable discretion in denying defendant's motion under Evidence Code section 352 to exclude Smith's testimony. The prosecution's case was based on circumstantial evidence and defendant's admissions. The trial court did not err in declining to exclude evidence of defendant's admission to Smith. Moreover, we agree with the state that there is no authority for the proposition that Evidence Code section 352 should be used to exclude prosecution evidence to avoid a conflict of interest between a defendant and his attorney.

### 6. *Application of Proposition 115 to Defendant's Case*

In June 1990, Proposition 115 was enacted into law by the electorate. Among its provisions was a provision calling for reciprocal discovery. (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 299 [279 Cal.Rptr. 592, 807 P.2d 434].) In September 1990, the district attorney, in reliance on this provision, filed a motion seeking discovery from the defense. At the hearing on the motion, the trial court addressed defendant's claims that applying Proposition 115's reciprocal discovery provision would violate principles governing retroactivity as well as the ex post facto prohibition. The trial court acknowledged that "this issue has yet to be ruled on by any appellate court," but stated it was "simply not convinced enough that the appellate court" would rule in the prosecution's favor on these issues. It therefore denied the motion.

In April 1991, in *Tapia v. Superior Court, supra,* 53 Cal.3d 299, we stated that application of the reciprocal discovery provision to evidence obtained by the defense after the passage of Proposition 115 did not constitute retroactive application of the statute. Apparently on the heels of our decision in *Tapia,* the district attorney renewed his motion for discovery. The trial court granted the motion as to any defense evidence generated after June 1990.

Defendant now argues that the trial court's reversal of its earlier ruling violated his "due process rights under the state and federal [C]onstitutions, because he justifiably relied on the court's previous order and long-settled principles of law in forming his trial strategy." Not so. Any such reliance on the trial court's September ruling would not have been justifiable in light of the fundamental change in law regarding reciprocal discovery effected by Proposition 115, and the trial court's own recognition that application of that change in the law to pending cases was in flux. Moreover, longstanding principles of law relevant to the applicability of procedural changes to pending cases should have alerted defendant to the distinct possibility that Proposition 115 would apply to his case. Finally, none of the cases he cites in support of his claim is apposite.

At the time of the district attorney's motion in September 1990, Proposition 115 had added article I, section 30, subdivision (c), to the California Constitution, "providing that 'discovery in criminal cases shall be reciprocal in nature, as prescribed by the Legislature or by the people through the initiative process.' " (*Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 371 [285 Cal.Rptr. 231, 815 P.2d 304].) As we noted in *Izazaga,* the "manifest intent behind the measure was to reopen the two-way street of reciprocal discovery. The preamble to Proposition 115 states that 'comprehensive reforms are needed *to restore balance* and fairness to our criminal justice system.' (Prop. 115, § 1(a), italics added.)" (*Id.* at p. 372.) Accordingly, defendant, like all other criminal defendants in the state, was on notice that the electorate had wrought a fundamental change in the law regarding discovery in criminal cases.

Defendant was also on notice that the related question of whether this change applied to pending cases was unsettled. As we observed in *Tapia,* "[b]oth the text of Proposition 115 and the related ballot arguments [were] entirely silent on the question of retrospectivity." (*Tapia v. Superior Court, supra,* 53 Cal.3d at p. 287.) While ordinarily such silence gives rise to the presumption that a new statute is intended to apply prospectively only, Proposition 115 contained provisions that governed the conduct of trials, rather than the definition of, punishment for, or defenses to crimes. As to such procedural provisions, the general rule is that they apply to trials that have not yet taken place because "[e]ven though applied to the prosecution of a

crime committed before the law's effective date, a law addressing the conduct of trials still addresses conduct in the future." (55 Cal.3d at p. 288.) Thus, in *Tapia*, as noted above, we concluded that the reciprocal discovery provision of Proposition 115 applied to cases that had not yet come to trial.

These principles were cited by the district attorney in his September 1990 motion to compel discovery. Indeed, he incorporated as an exhibit into his motion the Attorney General's return in *Tapia*, which was then pending before this court. Thus, as the trial court acknowledged, the question of the application of reciprocal discovery to people like defendant had not been settled by the appellate courts, although at that very moment the issue was pending before us. The trial court's ruling represented no more than its best guess about the eventual outcome of this controversy. Therefore, given the fundamental change in criminal discovery law effected by Proposition 115, the longstanding principles regarding application of procedural changes to future trials, the fact that the application of those principles to the reciprocal discovery provision was a question pending before this court, and the trial court's recognition that appellate review had not settled the question, defendant's claim that he justifiably relied on the September 1990 order is not persuasive.

No more persuasive is defendant's claim to have relied on "long-settled principles of law" in addition to the trial court's ruling. Preliminarily, he fails to identify what these principles might be. If he means the law regarding reciprocal discovery in criminal cases prior to Proposition 115, that law was abrogated by passage of the initiative and defendant relied on it at his own peril. If he means the rule that, unless specified, a new statute is presumed to apply prospectively, that was the very question that had not been settled at the time of the trial court's ruling.

Finally, none of the cases upon which defendant chiefly relies is apposite to this case. *People v. Mancheno* (1982) 32 Cal.3d 855 [187 Cal.Rptr. 441, 654 P.2d 211] primarily addressed the question of the remedy to which a defendant is entitled when a trial court fails to implement a provision of his or her plea agreement. Both *People v. Davis* (1994) 7 Cal.4th 797 [30 Cal.Rptr.2d 50, 872 P.2d 591], and *People v. King* (1993) 5 Cal.4th 59 [19 Cal.Rptr.2d 233, 851 P.2d 27] involved, in relevant part, whether the overruling of prior precedent that increased the punishment for a defendant's crimes after they were committed could be applied to pending cases without violating the ex post facto clause. We held, in each case, that the new rule could not be applied to such cases. (*People v. Davis, supra,* 7 Cal.4th at pp. 811–812; *People v. King, supra,* 5 Cal.4th at p. 80.) But the reciprocal discovery rule, as we stated in *Tapia*, is a procedural not a substantive change and thus does not implicate such ex post facto concerns. (*Tapia v. Superior*

*Court, supra,* 53 Cal.3d at pp. 297–299.) Finally, in both *People v. Scott* (1994) 9 Cal.4th 331 [36 Cal.Rptr.2d 627, 885 P.2d 1040] and *People v. Welch* (1994) 5 Cal.4th 228 [19 Cal.Rptr.2d 520, 851 P.2d 802], we declined to apply new rules requiring timely objections at sentencing hearings as a prerequisite to raising certain issues on appeal—a challenge to a probation condition as unrelated to defendant's offense, the failure of the court to articulate its discretionary sentencing choices—to cases in which the sentencing hearings had occurred prior to the finality of our decisions. We did this not as a matter of due process "but to ensure the equitable and orderly administration of the law." (*People v. Scott, supra,* 9 Cal.4th at p. 357.) None of these decisions supports defendant's claim that application of reciprocal discovery to his case violated his due process rights.

We conclude that defendant's claim is without merit.[14]

B. *Guilt Phase Issues*

1. *Evidentiary Rulings*

Defendant contends that the trial court erroneously admitted certain prosecution evidence while erroneously excluding certain defense evidence. We begin with a review of generally applicable principles pertaining to the admission and exclusion of evidence.

 " ' "Only relevant evidence is admissible [citations], and all relevant evidence is admissible unless excluded under the federal or California

---

[14] Our conclusion makes it unnecessary to address defendant's further claim that the alleged due process violation requires reversal per se. We do note, however, that the decision he cites in support of this proposition, *Coleman v. McCormick* (9th Cir. 1989) 874 F.2d 1280, is inapposite. In *Coleman,* the defendant was tried and sentenced to death under a statute—later held unconstitutional—that required the imposition of the death penalty on defendants convicted of aggravated kidnapping without any consideration of mitigating factors. A new death penalty law was enacted, permitting consideration of aggravating and mitigating factors, and retroactively applied to the defendant. He received a new sentencing hearing by the judge who presided over the original trial and who, in again imposing the death sentence, relied on evidence from the original trial, including defense evidence. In concluding that this procedure violated due process, the Ninth Circuit declared: "Coleman was sentenced to death under a statute not in effect at the time of his trial. The new statute added a sentencing 'trial' at which the sentencing judge could consider any evidence that came in during the guilt phase. By contrast, the old statute required the death penalty once a defendant was convicted of aggravated kidnapping. Coleman's counsel made countless tactical decisions at trial aimed solely at obtaining Coleman's acquittal, without even a hint that evidence in the record would be considered as either mitigating or aggravating factors." (*Id.* at p. 1289.) Here, by contrast, as noted, defendant was on notice as of June 1990 that the results of the defense's investigation might be discoverable by the prosecution. Defendant, unlike the defendant in *Coleman,* should be able to demonstrate how his investigation was adversely impacted by this possibility; he does not.

Constitution or by statute. [Citations.] Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts . . . . [Citations.]' [Citation.] The trial court has broad discretion in determining the relevance of evidence . . . ." ' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1166–1167 [32 Cal.Rptr.3d 759, 117 P.3d 476].) Relevant evidence may nonetheless be excluded under Evidence Code section 352 at the trial court's discretion if "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We review rulings under this section for abuse of discretion. (*People v. Ledesma* (2006) 39 Cal.4th 641, 701 [47 Cal.Rptr.3d 326, 140 P.3d 657].)

It is also well settled that the erroneous admission or exclusion of evidence does not require reversal except where the error or errors caused a miscarriage of justice. (Evid. Code, §§ 353, subd. (b), 354.) "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; see *People v. Rains* (1999) 75 Cal.App.4th 1165, 1170 [89 Cal.Rptr.2d 737].) Additionally, a party may not complain of the erroneous admission of evidence unless "[t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion . . . ." (Evid. Code, § 353, subd. (a); but see *People v. Partida, supra*, 37 Cal.4th at p. 431 [defendant who objects to admission of evidence at trial, and whose objection is overruled, may "argue that the asserted error in overruling the trial objection had the legal consequence of violating due process"].) Moreover, "[a]n appellate court may not reverse a judgment because of the erroneous exclusion of evidence unless the 'substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by *any other means*.' " (*People v. Livaditis* (1992) 2 Cal.4th 759, 778 [9 Cal.Rptr.2d 72, 831 P.2d 297]; see Evid. Code, § 354, subd. (a).)

Bearing these principles in mind we turn to the evidentiary issues raised by defendant.

### a. *Hair Evidence*

Defendant contends that the trial court erroneously admitted evidence of two hairs, prosecution exhibits 14-A-1 and 16-A-2, because they were neither relevant nor did the prosecution lay the proper foundation for their admission. He also contends that the trial court erred by permitting one of the prosecution's experts to testify to a probability study, referred to as the Gaudette study. Interwoven among these specific claims appears to be a general attack on the admission of the hair evidence on relevance grounds.

Preliminarily, the Attorney General argues that defendant has forfeited these claims because he failed to object to the admission of any of this evidence at trial. (*People v. Jablonski, supra,* 37 Cal.4th at p. 823.) Defendant argues, however, that the issues are preserved because the trial court overruled his objections to this evidence at his first trial, which ended in a mistrial. In support, he cites statements by the trial court regarding other objections he made at the first trial, which the trial court cited as a basis for overruling the same objections at his second trial. But none of these statements involved the admissibility of the hair evidence. "While it may not be necessary to renew an objection already overruled in the same trial [citation], absent a ruling or stipulation that objections and rulings will be deemed renewed and made in a later trial [citation], the failure to object bars consideration of the issue on appeal. . . . A defendant may not acquiesce in the admission of possibly excludable evidence and then claim on appeal that rulings made in a prior proceeding render objection unnecessary." (*People v. Clark* (1990) 50 Cal.3d 583, 623–624 [268 Cal.Rptr. 399, 789 P.2d 127], fn. omitted.) We agree, therefore, that the claims are forfeited.

Even if his claims were not forfeited, they are without merit. Charles Morton, one of the prosecution's experts, testified that the two hairs to which defendant specifically objects as irrelevant, exhibit No. 14-A-1, a fragment of pubic hair found on the victim's sweatshirt, and exhibit No. 16-A-2, a pubic hair found on the evidence envelope, were consistent with defendant's hair. Defendant argues that the prosecution failed to establish these hairs were relevant because it did not establish "that they were likely to have been placed at the scene of the crime by the perpetrator." Not so. Relevant evidence is evidence "having any *tendency* in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210, italics added.) The evidence need not be dispositive of the disputed fact. (See *People v. Geier* (2007) 41 Cal.4th 555, 587 [61 Cal.Rptr.3d 580, 161 P.3d 104].) Evidence that hair consistent with defendant's hair was recovered from the place where the murder occurred, and from the victim's garment, is plainly relevant under the statutory definition and the court did not abuse its discretion in admitting it. Defendant's claim that the prosecution

failed to establish how long exhibit No. 14-A-1 had been in the residence goes to the weight, not the admissibility, of the evidence. Absent a showing of abuse of discretion, we defer to the trial court's ruling.

Defendant also argues that exhibit No. 16-A-2 was admitted without a proper foundation because it was found on the evidence envelope that contained other hairs gathered at the scene which were identified as consistent with defendant's hair. At defendant's first trial, where he actually raised this objection, the trial court rejected the lack of foundation claim.

Although the record is not a model of clarity, the prosecution apparently maintained that the three hairs found under the tape of the evidence envelope, including exhibit No. 16-A-2, were originally in the envelope containing hairs collected from the debris of the bathtub where the victim was found. The other two hairs were consistent with either Naomi or Tammy Holley. The envelope went first to the Department of Justice and then for examination by the prosecution's first expert, Steven O'Clair. The hairs were not beneath the tape when O'Clair examined them and he examined all the hairs in an area that allowed for no contamination. The envelope was then sent to one of the defense experts, who, in turn, sent it to the prosecution's second expert, Charles Morton. Morton was the person who saw the hairs beneath the tape. The prosecution established further that neither O'Clair, who testified at the preliminary hearing, nor anyone on the prosecution team had opened the envelope during the preliminary hearing, which apparently occurred before the envelope was sent to the defense expert. The prosecution argued that it had laid a foundation for the admission of the hair and that, if the evidence had been mishandled, it had been mishandled by the defense expert, who examined the evidence between the times that O'Clair and Morton had examined it. The trial court overruled the objection.

■ In a chain of custody claim, the proponent of the evidence must demonstrate to the satisfaction of the trial court " ' "that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration." ' " (*People v. Catlin, supra*, 26 Cal.4th at p. 134.) The trial court's ruling on such a claim is reviewed for abuse of discretion. (*Ibid.*)

Here, the prosecution demonstrated that the hairs in question had undoubtedly been in the evidence envelope, which contained other hairs gathered from the bathtub at the Holley residence, rather than being stray hairs from an unknown source, notwithstanding the fact that the defense expert may have mishandled the evidence. Accordingly, we find no abuse of discretion.

■ Defendant also contends that the trial court erroneously allowed Steven O'Clair, one of the prosecution's experts, to testify that, according to a

study called, after its author, the Gaudette study, there was only a 1-in-800 probability that pubic hair identified as consistent with one person could have come from another person. Defendant did not object to the testimony, forfeiting the claim. In any event, there was considerable skepticism expressed by the other experts, including the prosecution's second expert, Charles Morton, about the validity of this study. The jury was capable of determining what weight to give this testimony. Defendant points to statements by the prosecutor emphasizing the study. It is axiomatic that statements by counsel are not evidence, and the jury was so instructed. Finally, to the extent that defendant is attacking the admission of any hair analysis evidence, we reject the argument; the evidence was clearly relevant and the trial court did not abuse its discretion in so ruling.

### b. *Defendant's Parole Status*

Defendant contends that the trial court erroneously admitted a portion of his statement to the police in which he noted that he had just been paroled from San Quentin. The statement was in the context of his expression of disgust toward child molesters: *"I've just paroled out of San Quentin.* I hate a child molester. *Even if I did go up for statutory rape,* you know what, that's the most sickest . . . that's the most lowest thing on this earth that you can do to another human being." He maintains that his references to having been paroled and his conviction for statutory rape (actually it was forcible rape) amounted to impermissible propensity evidence.

In overruling defendant's objection, the trial court concluded that the evidence was more probative than prejudicial under Evidence Code section 352 in that it corroborated testimony by Tammy Petrea that defendant had killed April because he did not want to be reincarcerated, and testimony by David Jurkovich regarding defendant's statement that April "wasn't the first and she won't be the last." The trial court also found that the statement was probative of defendant's knowledge of the sexual assault on April, which was known only to the perpetrators and police.

We need not decide whether the trial court abused its discretion under Evidence Code section 352 when it admitted this brief mention of defendant's parole status and prior imprisonment because, even if the court erred, defendant could not possibly have been prejudiced. Before allowing the tape of the interview to be played, the court instructed the jurors on the proper use of the evidence, warned them that they would hear mention of defendant being on parole, and admonished them that the statements were not to be considered as evidence of propensity to commit the crimes at issue in this case. We deem this admonition to have adequately ensured that the jury would not use these fleeting references as propensity evidence and thus their admission, even if error, was harmless.

### c. *Victim Photographs*

Defendant contends that the admission of three photographs depicting injuries to April's genitals were irrelevant or, if relevant, that their probative value was outweighed by their prejudicial effect. The prosecution introduced these photographs into evidence in connection with the testimony of Dr. McCann, a child sexual abuse expert, and Dr. Miller, who performed the autopsy.[15]

Preliminarily, while defendant indicated prior to trial that he would object to crime scene and autopsy photographs as cumulative, at trial he failed to object to these photographs on any ground. Accordingly, he has forfeited his claim. (*People v. Farnam, supra,* 28 Cal.4th at pp. 160–161.)

His contentions also lack merit. It is settled law that " 'admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory.' " (*People v. Scheid* (1997) 16 Cal.4th 1, 18 [65 Cal.Rptr.2d 348, 939 P.2d 748].) We would not disturb the trial court's decision to admit the photographs unless " 'the probative value of the photographs clearly is outweighed by their prejudicial effect.' " (*Ibid.*) Contrary to defendant's claim, the photographs were highly relevant to the prosecution's case. The photographs showed the nature and placement of April's injuries and tended to corroborate the prosecution's theory that April was raped and sodomized. Defendant argues that there was no dispute April was raped. Not so. At trial, neither defendant nor anyone else admitted raping or sodomizing April, and the prosecution was therefore required to prove those allegations. The photographs were relevant to that purpose. Moreover, the photographs assisted the testimony of the prosecution's child sexual abuse expert and the testimony of the doctor who performed the autopsy of April's body.

Moreover, having examined the exhibits in question, we also reject defendant's claim that the nature of the photographs rendered them more prejudicial than probative. While the photographs are unpleasant because they depict injuries to a child's genitalia, they cannot be accurately described as gruesome.[16] Certainly, they would not have invoked the kind of prejudicial effect

---

[15] We requested these exhibits from the superior court. The court provided exhibits 17 and 19 but informed us that exhibit 14 could not be located. However, all of the victim photographs were attached to the prosecutor's trial brief seeking their admission. While the quality of the photocopies is not very good, it is at least possible to conclude that these photographs, including exhibit 14, were no more inflammatory or gruesome than exhibits 17 and 19.

[16] Defendant also argues that the pictures were especially prejudicial at the penalty phase. Not so. The prosecution has even more latitude to illustrate the crime through photographs at

that is the particular concern of Evidence Code section 352. (*People v. Jablonski, supra*, 37 Cal.4th at p. 805 [" 'Evidence is substantially more prejudicial than probative (see Evid. Code, § 352) if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" . . .' " (citation omitted)].)

### d. *Victoria Lopez's Testimony*

Over defendant's hearsay objection, the prosecution was permitted to ask Bobby Joe Marshall, Jr., whether he told Victoria Lopez that he, defendant, and Steven Brown were at the Holley residence the night April was murdered and that all three men had had sex with her. Marshall denied having made the statements. The prosecution then called Victoria Lopez who testified that Marshall had made these statements to her. Her testimony was admitted over defendant's hearsay objection as a prior inconsistent statement by Marshall. (Evid. Code, § 1235.)

On appeal, defendant renews the objection he made below that the admission of Lopez's testimony violated his confrontation rights. As he did below, he relies primarily on *People v. Rios* (1985) 163 Cal.App.3d 852 [210 Cal.Rptr. 271].

" 'The receipt in evidence of a prior inconsistent statement does not violate the confrontation clauses of the federal and state Constitutions where the declarant testifies at trial and is subject to cross-examination.' " (*People v. Williams* (1997) 16 Cal.4th 153, 200 [66 Cal.Rptr.2d 123, 940 P.2d 710].) Here, Bobby Joe Marshall, Jr., testified at trial and "when given an opportunity to explain or deny [his] statements, . . . denied that he made them." (*Id.* at p. 199.) Thus, this case is distinguishable from the *Rios* case because there the two witnesses who were impeached with prior inconsistent statements refused to testify when called to the witness stand. In finding the admission of their prior inconsistent statements was error, the reviewing court cited the rule that " 'there is no "testimony" from which an inconsistency with any earlier statement may be implied when the witness honestly has no recollection of the facts,' " and extended it to a situation " 'where a witness gives no testimony and refuses to answer all questions.' " (*In re Deon D.* (1989) 208 Cal.App.3d 953, 962 [256 Cal.Rptr. 490].)

Defendant also asserts—apparently for the first time—that admission of Marshall's statement to Lopez violated *People v. Aranda* (1965) 63 Cal.2d

---

the penalty phase than it does at the guilt phase. As we recently stated, "[s]uch evidence cannot prejudice the defendant as to guilt, and the brutal circumstances assist the jury in making its normative [citation] penalty decision." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1055 [47 Cal.Rptr.3d 467, 140 P.3d 775].) Because we have determined the photographs at issue here were admissible even at the guilt phase, they were certainly admissible at the penalty phase.

518 [47 Cal.Rptr. 353, 407 P.2d 265] and *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]. Even if this claim is not forfeited, it is without merit. "*Bruton* and its progeny provide that if the prosecutor in a joint trial seeks to admit a nontestifying codefendant's extrajudicial statement, either the statement must be redacted to avoid implicating the defendant or the court must sever the trials." (*People v. Hoyos* (2007) 41 Cal.4th 872, 895 [63 Cal.Rptr.3d 1, 162 P.3d 528].) *Bruton* is inapplicable here, as Marshall was neither a codefendant nor on trial.

■ Finally, defendant suggests that Lopez's testimony runs afoul of *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354]. "*Crawford* . . . held that testimonial out-of-court statements offered against a criminal defendant are rendered inadmissible by the confrontation clause unless the witness is unavailable at trial and the defendant has a prior opportunity for cross-examination." (*People v. Geier, supra*, 41 Cal.4th at p. 597.) Here, Marshall testified at defendant's trial and was obviously available for cross-examination.

### e. *Exclusion of Defendant's Bathwater Expert*

Defendant contends the trial court erroneously excluded expert testimony that he claims would have supported his defense that April was murdered in the early morning of Sunday, December 4 by Steven Brown acting alone, rather than by defendant and Brown on the night of December 3. Specifically, defendant proposed to call Dr. Garrison Kost, a civil and structural engineer, to testify to the "outflow rate of water in the bathtub based on commonly accepted principles of flow and volume." The purpose of this testimony was to make a backward projection as to what time the bathtub had been filled to capacity to show that April was killed about 1:30 in the morning of December 4, and thus not by defendant, rather than at 9:30 p.m., the previous night, as suggested by the testimony of various prosecution witnesses.

Conceding that "we have no precise data in this case, and no precise measurements," defense counsel stated that Kost's testimony would be based on an estimate given by Detective Johnson regarding the water level. Johnson testified that, when he saw April at 2:30 p.m. on Sunday, there were five inches of water in the bathtub and, when he removed the rag in the drain at 6:23 p.m., there were about two or three inches left. The prosecution objected on the ground that "Detective Johnson testified that this was just an estimate. It could have been as little as three inches, and as much as five inches." The court also pointed out that another problem with the expert's assumption regarding the amount of water in the bathtub was that "there's an assumption being made here that this tub was actually filled up to the overflow pipe,

which is something else we don't know, so we're left with speculation." Additionally, the prosecutor pointed out, "there's no way to determine whether April's face was on the drain, which would affect the flow. [¶] There's no way of knowing the effect of the removal of the body from the tub on the rag." He also pointed out other prosecution witnesses had given other estimates regarding the amount of water in the tub.

The court concluded that "we're gonna spend more time on this than it has probative value," but nonetheless allowed the defense to put Kost on the stand outside the presence of the jury. Following Kost's testimony, however, the trial court sustained the prosecution's objection and excluded the evidence because "there's just too many variables here, that this is far more likely to prejudice this case than to be of any probative value, particularly with respect to the issue of the estimate of the tub's depth at the two points in time. [¶] You just can't accurately establish it, and it just leads to speculation."

 Under Evidence Code section 352, the trial court has wide discretion to exclude evidence on the grounds that its probative value is substantially outweighed by the risk of undue delay, prejudice or confusion. (*People v. Geier, supra*, 41 Cal.4th at p. 581.) This discretion extends to the admission or exclusion of expert testimony. (*People v. Gardeley* (1996) 14 Cal.4th 605, 619 [59 Cal.Rptr.2d 356, 927 P.2d 713].)

"Generally, an expert may render opinion testimony on the basis of facts given 'in a hypothetical question that asks the expert to assume their truth.' [Citation.] Such a hypothetical question must be rooted in facts shown by the evidence, however. [Citations.]" (*People v. Gardeley, supra*, 14 Cal.4th at p. 618.) It is true that "it is not necessary that the question include a statement of all the evidence in the case. The statement may assume facts within the limits of the evidence, not unfairly assembled, upon which the opinion of the expert is required, and considerable latitude must be allowed in the choice of facts as to the basis upon which to frame a hypothetical question." (*People v. Wilson* (1944) 25 Cal.2d 341, 349 [153 P.2d 720].) On the other hand, the expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors . . . . [¶] Exclusion of expert opinions that rest on guess, surmise or conjecture [citation] is an inherent corollary to the foundational predicate for admission of the expert testimony: will the testimony assist the trier of fact to evaluate the issues it must decide?" (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117 [8 Cal.Rptr.3d 363].)

Kost's reliance on Detective Johnson's estimates of the amount of water in the bathtub was questionable given that Johnson's testimony was based on estimates, not measurements, and that other witnesses made other estimates.

But even if Kost could have relied on these estimates, as the trial court and the prosecutor pointed out, there were a number of variables that could have affected the outflow as to which there was no evidence at all, e.g., whether the tub had been filled to the overflow pipe, whether April's face had blocked or partially blocked the drain, and the effect of the removal of April's body. Given these uncertainties, we cannot say the trial court abused its discretion in excluding Kost's testimony.[17]

### f. *Exclusion of Impeachment Evidence*

Defendant contends that the trial court erred when it excluded evidence of Tammy Petrea's juvenile adjudication for narcotics use as well as prior testimony that defendant argues was inconsistent with her trial testimony regarding her whereabouts on Friday, December 2, the day before April's murder. The trial court excluded both bits of proposed impeachment evidence on the ground they related to collateral matters. Given Petrea's extensive testimony about her drug use and prostitution, and the fact that she was impeached with three felony convictions, the trial court's ruling was well within its discretion. (*People v. Ayala* (2000) 23 Cal.4th 225, 301 [96 Cal.Rptr.2d 682, 1 P.3d 3] [purpose of trial court's discretion to exclude impeachment evidence under Evid. Code, § 352 is " 'to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues' "].)

### g. *Exclusion of Steven Brown and Related Claim of Instructional Error*

At defendant's first trial, defense counsel sought to compel the testimony of Steven Brown, who was then in custody for April's murder. Brown's attorney informed the court that Brown would exercise his Fifth Amendment privilege against self-incrimination as to any questions. Nonetheless, at defense counsel's insistence, outside the presence of the jury, Brown was sworn in and declined to respond to any questions. Defense counsel argued that defendant had a right to call Brown so the jury could see his physical size—he was over six feet tall and weighed over 200 pounds—to rebut prosecution testimony that it would have taken two people to subdue April

---

[17] Defendant cites events that occurred at the trial of Steven Brown as further reason why the trial court erred in excluding Kost's testimony, but considering that Brown's trial took place three years after defendant's trial, this information was obviously not before the trial court when it made its ruling, and is irrelevant for purposes of our review of that ruling. (*People v. Carpenter* (1997) 15 Cal.4th 312, 408 [63 Cal.Rptr.2d 1, 935 P.2d 708] ["The argument, based on events occurring after this trial, is not cognizable on direct appeal. [Citation.] Moreover, a ruling by a different court in a different trial has no bearing on the correctness of the rulings in this trial."].)

Holley. Defense counsel also argued that Brown did not have a privilege with respect to certain questions about his 1988 incarceration and 1990 release date, and the offense which had led to his 1988 incarceration, or to questions about his sexual assault on Margaret A., which occurred after the Holley murder and bore similarities to it.

The trial court rejected defense counsel's argument that evidence regarding the assault on Margaret A. was not privileged because that case was on appeal, and rejected as irrelevant testimony regarding Brown's prior arrests, noting also that whatever point counsel was attempting to make could be done "simply by putting in the arrest records." As to Brown's physical size, the prosecutor pointed out that the Holley murder had occurred four years previously and there was "no assurance that Mr. Brown's physical size as far as his weight and his strength would be the same; therefore, the probative value of seeing him at this point is minimal." He also observed that the defense could make the point about Brown's size by other methods. The court agreed "the probative value of this is . . . minimal." Brown's attorney also objected on his client's behalf to being compelled to appear, noting that his sister, who was a witness in defendant's trial, "could testify to his size and weight." The court also noted that Brown's appearance—"in shackles, and in prison clothes, and unshaven"—could lead the jury to speculate about Brown's propensity for being dangerous rather than the issue of his size. The court denied the defense motion.

Subsequently, the defense asked the trial court to instruct the jury that it was prevented from calling Brown because of his assertion of the privilege. Initially, the court was inclined to do so, but denied the request based on the prosecution's argument that such instruction was precluded by Evidence Code section 913.

At this second trial, defendant renewed his motion to compel Brown's testimony based on the reasons presented at his first trial. Defense counsel acknowledged that he had been informed by Brown's attorney that he would once again be asserting the privilege against self-incrimination. However, he argued that Brown's size was particularly relevant because of Roger Rummerfield's testimony that Brown and defendant were about the same height. He also suggested that Brown be dressed in civilian clothing to allay concerns about his appearance. The prosecutor noted that he had stipulated to Brown's weight and height and that at the previous trial the defense had been allowed to put into evidence a "full body photograph." The court denied the motion based on representations that Brown would again invoke the privilege.

Defendant contends the trial court erred by failing to compel Brown to assert his privilege before the jury; by precluding Brown from answering

questions regarding his 1988 through 1990 incarceration and subsequent release, and about the Margaret A. case; and by failing to compel Brown to appear before the jury so it could assess his physical dimensions to rebut prosecution testimony that a single person could not have subdued April. Finally, he argues the trial court erred in failing to instruct the jury that Brown's assertion of the privilege prevented the defense from calling him.

 We reject these claims. As to defendant's first claim, we have observed: "Allowing a witness to be put on the stand to have the witness exercise the privilege before the jury would only invite the jury to make an improper inference. [Citations.] Therefore, 'it is the better practice for the court to require the exercise of the privilege out of the presence of the jury.' [Citation.] We have 'commend[ed]' the approach 'as a means by which to avoid the potentially prejudicial impact of the witness asserting the privilege before the jury.' [Citation.]" (*People v. Frierson* (1991) 53 Cal.3d 730, 743 [280 Cal.Rptr. 440, 808 P.2d 1197]; see *People v. Smith* (2007) 40 Cal.4th 483, 516 [54 Cal.Rptr.3d 245, 150 P.3d 1224].) The trial court appropriately followed this procedure.

As to defendant's second point, he fails to demonstrate that the trial court erred in determining that evidence of his 1988 through 1990 incarceration was irrelevant or, if relevant, could not have been established by means other than calling Brown. Moreover, his claim that the trial court failed in its duty to evaluate the extent of Brown's privilege by conducting voir dire ignores the fact that, when given the opportunity to question Brown, defense counsel declined to do so, thus indicating acquiescence in the claim of privilege. With respect to the Margaret A. case, as Brown had not yet been tried for the Holley murder in which his assault on Margaret A. would undoubtedly have been relevant, defendant fails to demonstrate that he could have inquired of Brown in any manner that would not have violated his privilege.

We also reject defendant's claim that Brown should have been called to allow the jury to assess his physical dimensions. Defendant contends that such evidence would have been relevant to rebut testimony that one person alone could not have subdued April. But this was not the testimony; it was that the circumstances of her drowning—in which her lower extremities did not show immersion in water—were suggestive of more than one perpetrator. Thus, the relevance of Brown's size was, as the court noted, of minimal probative value, particularly because his stature could be established by other means. We conclude therefore that the trial court did not err in denying defendant's request. (See *People v. Mincey* (1992) 2 Cal.4th 408, 443 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

Finally, the trial court did not err in declining to instruct the jury that Brown did not testify because of his assertion of the privilege. Such an

instruction may have invited the jury to infer that Brown had invoked the privilege because he was guilty of the offense. Such inference is impermissible. (Evid. Code, § 913; *People v. Holloway* (2004) 33 Cal.4th 96, 130 [14 Cal.Rptr.3d 212, 91 P.3d 164] ["a person may invoke the privilege for reasons other than guilt, and '[a] defendant's rights to due process and to present a defense do not include a right to present to the jury a speculative, factually unfounded inference' "]; *People v. Bernal* (1967) 254 Cal.App.2d 283, 294 [62 Cal.Rptr. 96] ["the defendant, as opposed to the witness, has no right which he may assert superior or even equal to that of the witness who exercises the privilege against self-incrimination . . . . [T]he claim of privilege having no evidentiary value, it could have no relevance to the question of defendant's guilt or innocence"].)

### 2. *Prosecutorial Misconduct Claims*

#### a. *Prosecutorial Decisions Affecting Bobby Joe Marshall, Jr.*

Defendant makes a lengthy, convoluted, and ultimately meritless claim that accuses the prosecutor of "drop[ping] charges against Bobby Joe Marshall, Jr., even though the evidence showed and the prosecutor still believed that Bobby Joe Marshall was involved in April's murder, and then knowingly present [*sic*] the perjured testimony of Bobby Joe Marshall, Jr. as the truth. Moreover, the prosecutor hid the fact that Bobby Joe Marshall, Jr. believed the prosecution had given him immunity in return for his testimony . . . . In his rebuttal argument the prosecutor also misled the jury about the possibility that the District Attorney's Office would charge Bobby Joe Marshall, Jr. with April's murder at some other time."

At defendant's trial, Marshall testified that defendant told him he had killed April in the early morning hours of Sunday, December 4. This testimony was consistent with a statement Marshall made to police in March 1991, after Marshall himself had been charged with the murder. Before being charged, Marshall had told police he did not know who had killed April. After he told police about defendant's admission, the charges against Marshall arising from April's murder were dismissed. Marshall obtained a plea bargain for drug charges involving incidents that occurred after April's murder, but he was not given immunity for this testimony against defendant. In his closing argument, the prosecutor observed, "no one said anything about what's going to happen to Mr. Marshall in the future," as well as told the jury that Marshall had not been offered immunity.

The prosecutor also explained to the jury that he disbelieved Marshall's testimony about defendant's admission as well as Marshall's alibi testimony,

which was that on the night of the murder he was driving around with Steven Brown and Joe Mills. He told the jury he had called Marshall as a witness because Marshall was "the connector, and the common denominator between Steve Brown and Charlie Richardson. Did we present [Marshall's] testimony regarding the defendant's statements to him in the bedroom because it's true? No. [Marshall] talked to Charlie Richardson all right, but it was the next morning . . . when they were in the bedroom with Steve Brown, Charlie Richardson, and Bob Marshall, Jr. That's the import of that testimony." In other words, the prosecutor suggested that Marshall was present when April was killed.

Marshall also testified at Steven Brown's trial, which followed defendant's trial. At Brown's trial, Marshall testified on direct examination that he had been offered immunity "to charges other than murder" if he told police what had happened at the Holley residence, but had not been "granted immunity in this case." On cross-examination, Marshall testified that he believed he had been offered immunity from charges arising from April's murder. When, however, defense counsel prefaced a question with the statement, "After you were granted immunity," the prosecutor objected that the question misstated the evidence and the objection was sustained.

Based on this sequence of events, defendant asserts that the prosecutor made "assurances, if he did not make explicit promises, to encourage [Marshall] to come up with his story about [defendant] confessing the crime to him." The claim that the prosecution suborned perjury is utterly without support in the record and warrants no further discussion.

 In a corollary claim, defendant suggests that the prosecutor dropped charges against Marshall arising from April's murder in exchange for Marshall's false statement that defendant confessed to him. Again, the assertion is without support in the record. Moreover, "[p]rosecutors have broad discretion to decide whom to charge, and for what crime. As we have observed, '[i]t is well established, of course, that a district attorney's enforcement authority includes the discretion either to prosecute or to decline to prosecute an individual when there is probable cause to believe he has committed a crime.'" (*People v. Lucas* (1995) 12 Cal.4th 415, 477 [48 Cal.Rptr.2d 525, 907 P.2d 373].) There may have been many reasons— including the fact that, at the time of the crime, Marshall was only 15 years old or that there was insufficient evidence to charge Marshall as an accomplice—that the prosecutor may have considered in deciding against prosecuting him. On the record before us, it is impossible to determine what factors led the prosecution to decide against pursuing charges against Marshall, and certainly there is no basis for any of the invidious conclusions drawn by

defendant. Rather, we assume that the prosecutor's decision regarding prosecution of Marshall involved factual and legal variables committed to the prosecutor's sound discretion.

Defendant also complains that the trial prosecutor misled the jury by suggesting that Marshall might yet be charged with crimes arising from April's murder. Preliminarily, defendant did not object to these remarks and therefore his claim is forfeited. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 [64 Cal.Rptr.2d 400, 938 P.2d 2].) In any event, there was no misconduct by the prosecutor. In an argument that acknowledged the convoluted circumstances involving Marshall, he said that the decision to prosecute rests on a number of considerations, "and we told you right up front that the case was dismissed against Bob Marshall, Jr., back in March," before stating, truthfully, that "no one said anything about what's going to happen to [Marshall] in the future," and warning the jury against speculation along those lines. We find no impropriety in this argument.

 Nor do we agree with defendant that the prosecutor presented false testimony to the jury because he disbelieved Marshall's testimony that defendant had confessed to him and instead believed that Marshall was present when April was killed. " 'Under well-established principles of due process, the prosecution cannot present evidence it knows is false and must correct any falsity of which it is aware in the evidence it presents . . . .' [Citation.]" (*People v. Harrison* (2005) 35 Cal.4th 208, 242 [25 Cal.Rptr.3d 224, 106 P.3d 895].) That did not happen here. In this case, the prosecutor was very clear about his assessment of Marshall's testimony and why he had presented it notwithstanding his doubts about Marshall's veracity. He frankly told the jury he did not believe Marshall was being truthful when he testified that defendant had confessed to him—"Did we present Junior's testimony regarding the defendant's statements to him in the bedroom because it's true? No."

Rather, he explained that he believed Marshall had spoken to defendant and Brown about the crime the next morning when the three of them were overheard by Kim Fleeman talking about getting their stories straight. The prosecutor explained that the significance of Marshall's testimony from the prosecutor's perspective was that Marshall connected defendant to Brown. Furthermore, while the prosecutor had his opinion about Marshall's credibility and shared that opinion with the jury, he was not present at the events about which Marshall testified and therefore could not definitively have known whether Marshall was perjuring himself. Under these circumstances, we reject defendant's claim that the prosecutor violated his due process rights by knowingly presenting false evidence. (See *People v. Gordon* (1973) 10 Cal.3d 460, 474 [110 Cal.Rptr. 906, 516 P.2d 298] [no denial of due process

where prosecutor makes it clear that a prosecution witness's testimony was of "doubtful veracity" so that the jury could decide which "of the conflicting versions of the incidents in question was true," and prosecutor did not know that testimony was perjured].)

### b. *Inconsistent Theories*

Defendant contends that the prosecutor violated his due process rights by presenting factually and legally inconsistent theories at his trial and the trial of Steven Brown.[18] In *In re Sakarias* (2005) 35 Cal.4th 140 [25 Cal.Rptr.3d 265, 106 P.3d 931], we held "that the People's use of irreconcilable theories of guilt or culpability, unjustified by a good faith justification for the inconsistency, is fundamentally unfair, for it necessarily creates the potential for—and, where prejudicial, actually achieves—a false conviction or increased punishment on a false factual basis for one of the accuseds." (*Id.* at pp. 159–160.)

The scenario presented by *Sakarias* was that in the separate trials of *Sakarias* and his codefendant Waidla, the prosecutor "attributed first to Waidla alone and later to Sakarias alone . . . a series of blows to the victim's head with the hatchet blade. These two theories are irreconcilable; that Waidla alone inflicted each of these wounds, as the prosecutor maintained at his trial, and that Sakarias alone also did so, as the prosecutor maintained at his trial, is not possible. One or the other theory (or both, if each man inflicted some but not all of the wounds) must be false." (*In re Sakarias, supra,* 35 Cal.4th at p. 160.) In our analysis of the prejudicial effect of the misconduct, we observed, "where the probable truth of the situation can be determined—where we are able to say which of the prosecution theories was likely true and which false—only the defendant prejudiced by the *false* attribution is entitled to relief." (*Id.* at p. 164.)

Defendant maintains that in this case, as in *Sakarias,* the prosecutor argued that defendant killed April, and Brown merely assisted, while at Brown's trial, evidence was presented that Brown committed the murder and, furthermore, that this evidence was suppressed by the prosecutor at defendant's trial. The claim is without merit.

The prosecution's position at *both* defendant's and Brown's trials was that defendant was April's actual murderer with Brown acting as an aider and abettor. At defendant's trial, the prosecutor told the jury in closing argument, "Charles Richardson is the actual murderer," and that Brown "was not the

---

[18] The trial court granted defendant's motion to augment the record in his case with the record of the Brown trial.

actual murderer, but he was there, and he helped." To support this theory that Brown was not the actual murderer, the prosecutor referred to his sexual assault on Margaret A. in which he attempted to drown her in her bathtub but stopped his attack after she resisted him: "If he, Steve Brown, had killed an eleven year old girl before, by himself, he wouldn't have stopped with Margaret A[.]"

Similarly, the prosecutor at Brown's trial argued, "We know that April Holley was molested, that she was raped, that she was sodomized, and that she was murdered by drowning in a bathtub. [¶] How do we know that? We know that Charles Richardson has been convicted of those very crimes. But what else do we know? We know that Charles Richardson did not and could not have acted alone in his particular crimes. We know that Charles Richardson and Steven Brown were accomplices, that they aided and abetted one another in the commission of these crimes on April Holley."[19]

Defendant, nonetheless, maintains that the prosecution at the Brown trial relied on testimony that was not admitted at defendant's trial and which depicted Brown, not defendant, as April's murderer. He claims further that the prosecutor at the Brown trial emphasized this evidence to make that point. An examination of those passages of the record to which defendant directs us does not support this claim.

Defendant points to evidence that Rhonda Schaub, Brown's girlfriend around the time of the murder, testified that Brown confessed to her that he had killed April. What Schaub actually said was that she "asked [Brown] several times if he had any involvement in her death. And not in the first conversation, the first couple conversations, but he was mad at me one morning and it come out [sic] that he told me that he had killed April, but he would never be caught." This testimony followed testimony by other witnesses, among them Kim Fleeman, who also testified at defendant's trial, that defendant, Brown and Marshall had been involved in the murder. In context, then, Schaub's testimony that Brown said he "killed" April did not necessarily convey the meaning that defendant ascribes to it—that Brown personally murdered her. Rather, it can just as well be understood as meaning that he was involved in the killing along with defendant and possibly Marshall. Moreover, contrary to defendant's further claim, the prosecutor did not emphasize Schaub's testimony in a manner that suggested Brown, and not

---

[19] Defense counsel's argument, unchallenged by the prosecution at the Brown trial, was even more explicit: "And the last thing that you've got to consider is whether or not Charles Richardson acted alone, *because the starting place for this trial is the fact that Charles Richardson is guilty of killing April Holley. You know that. You heard his confession . . . . The question is whether or not he acted alone.*" Plainly, if the Brown jury heard that defendant confessed to killing April, the prosecution was not hiding the ball from anyone as to the respective roles defendant and Brown played in the murder.

defendant, personally killed April. The prosecutor merely argued that Schaub's testimony was evidence of Brown's participation—"he confessed to her he had killed April Holley"—but not that Brown personally committed the murder to the exclusion of defendant. Indeed, in his final remark to the jury, the prosecutor asked it to find Brown guilty of the murder of April Holley because "*Richardson* did not act alone."

Even less compelling is the testimony of Lynn Farmer, another witness who defendant maintains was used in the Brown prosecution to establish that Brown personally killed April. Farmer testified to no such thing. He testified merely that Brown told him he had done to Margaret A. the same thing he had done to April, not kill her, but sodomize her. Farmer testified: "[Brown] said he did the same thing to the old lady as he did to April. [¶] . . . [¶] 'F—d her in the ass.' " There was no question that Brown had done so.[20]

Unlike *Sakarias*, then, the prosecutor did not argue at defendant's trial that defendant alone had killed April and then, inconsistently at Brown's trial, that Brown had killed April. The prosecutors in both cases proceeded on the theory that defendant was the killer and Brown aided and abetted him. Variations in emphasis where, as here, the underlying theory of the case was consistent at both trials, does not amount to inconsistent and irreconcilable theories. (*In re Sakarias, supra*, 35 Cal.4th at p. 161, fn. 3.)

c. *Comparison of Photographs*

Defendant also argues the prosecutor committed misconduct in closing argument because he "improperly asked the jury to second-guess the experts by becoming experts themselves and compare the photographs of the pubic hair evidence to decide for themselves whether they matched." Defendant failed to object to the prosecutor's argument on this ground and thus failed to preserve the issue for appeal. (*People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673].) Were we to reach the issue, we would find no error. The permissible scope of closing argument is broad, and the prosecutor's recommendation that the jury should use its common sense when

---

[20] Nor do defendant's complaints about the exclusion at his trial of testimony by Farmer or Schaub, or of Brown's testimony in the Margaret A. trial change this analysis. Preliminarily, to the extent his challenge is to the trial court's rulings, it appears that he failed to press the court for a ruling as to Farmer's testimony after the court tentatively excluded the evidence but reserved final decision. Thus, any assignment of error is forfeited. He also concedes that there is no record of the portion of Schaub's testimony—that Brown told her he killed April—he claims was erroneously excluded in defendant's trial. Thus, it is not clear that this is the evidence that was excluded. Even if was, its exclusion does not support his assertion that the prosecutor sought to exclude it to argue inconsistently that defendant, not Brown, killed April. As noted above, Schaub's testimony provided evidence that Brown participated in the murder—a point the prosecution in defendant's case did not seek to conceal from the jury—but not necessarily that he was the actual killer. Finally, he does not demonstrate that the trial court's exclusion of Brown's testimony in the Margaret A. case was error.

both evaluating conflicting expert evidence and examining the photographs fell well within the boundaries of permissible argument.

### 3. *Sufficiency of the Evidence for Lewd Conduct*

 Defendant contends that insufficient evidence supports his conviction of lewd and lascivious conduct on a child under the age of 14 (§ 288) where he was also convicted of rape and sodomy, unless there was evidence of lewd conduct independent of the evidence supporting the rape and sodomy convictions. As he acknowledges, we have previously considered and rejected this argument in other cases. (*People v. Benavides* (2005) 35 Cal.4th 69, 97 [24 Cal.Rptr.3d 507, 105 P.3d 1099] ["Unless one offense is necessarily included in the other [citation], multiple convictions can be based upon a single criminal act or an indivisible course of criminal conduct (§ 954). Lewd conduct with a child is not a necessarily included offense of either rape or sodomy, which require only general intent."]; *People v. Siko* (1988) 45 Cal.3d 820, 823 [248 Cal.Rptr. 110, 755 P.2d 294] ["Thus if a person rapes a 13-year-old, he can be convicted of both rape and lewd conduct with a child on the basis of that single act, but he cannot be punished for both offenses; execution of the sentence for one of the offenses must be stayed."]; *People v. Pearson* (1986) 42 Cal.3d 351, 354–363 [228 Cal.Rptr. 509, 721 P.2d 595].)

### 4. *Claims of Guilt Phase Instructional Error*

#### a. *Erroneous Instruction on Sodomy as a Basis for Felony Murder*

Defendant argues, and the Attorney General concedes, that the trial court erred in instructing the jury that it could convict defendant of first degree murder based on sodomy. At the time of April's murder, sodomy was not included in section 189's enumeration of felonies supporting a first degree felony-murder conviction; sodomy was added in June 1990 when the voters approved Proposition 115. In this case, however, the error is harmless in light of the jury's finding that the murder was committed in the commission of burglary, rape, and lewd acts. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 97–98 [17 Cal.Rptr.3d 710, 96 P.3d 30] [erroneous instruction on sodomy felony-murder theory harmless because the jury's verdict on the robbery and burglary charges and related special circumstance allegations reflect that the first degree murder conviction was grounded upon other valid legal theories of felony murder]; accord, *People v. Hughes* (2002) 27 Cal.4th 287, 368 [116 Cal.Rptr.2d 401, 39 P.3d 432]; see also *People v. Marshall* (1997) 15 Cal.4th 1, 38 [61 Cal.Rptr.2d 84, 931 P.2d 262] [erroneous instruction on robbery felony-murder theory harmless where "the jury unanimously found defendant guilty of first degree murder on the valid theory that the killing occurred during the attempted commission of a rape"].)

### b. *References to "Innocence" in CALJIC Nos. 1.01, 2.01, 2.51 and 2.52*

Defendant contends that references to "innocence" in the jury instructions given at his trial (CALJIC Nos. 1.01, 2.01, 2.51 & 2.52) unconstitutionally shifted the burden of proof by suggesting that defendant was required to prove his innocence rather than that the prosecution bore the burden to prove him guilty beyond a reasonable doubt.[21] "This court and the Court of Appeal have rejected this claim in prior decisions [citations], and we do so again here. In light of the numerous instructions directing the jury to convict only on proof beyond a reasonable doubt of guilt [e.g., CALJIC Nos. 2.90, 8.71, 8.80], no reasonable likelihood the jury would have understood the challenged instructions otherwise exists." (*People v. Snow* (2003) 30 Cal.4th 43, 97 [132 Cal.Rptr.2d 271, 65 P.3d 749], fn. omitted; see *People v. Frye* (1998) 18 Cal.4th 894, 957–958 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

### c. *CALJIC No. 2.03*

Defendant contends that the trial court erroneously instructed the jury with CALJIC No. 2.03, which permits the jury to consider any willfully false or deliberately misleading statement made by defendant as a circumstance tending to show consciousness of guilt provided that the jury first determines that he made such a statement. Defendant contends the instruction is an improper pinpoint instruction. We have previously considered and rejected such criticisms of the instruction. (*People v. Bacigalupo* (1991) 1 Cal.4th 103, 127–128 [2 Cal.Rptr.2d 335, 820 P.2d 559]; *People v. Kelly* (1992) 1 Cal.4th 495, 531–532 [3 Cal.Rptr.2d 677, 822 P.2d 385].) We do so again here.

### d. *CALJIC Nos. 2.06, 2.52, 2.71.5*

#### i. *CALJIC No. 2.06*

Defendant contends the trial court violated his due process rights by instructing the jury with CALJIC No. 2.06 over his objection. That instruction permitted the jury to consider as a circumstance showing consciousness of guilt defendant's suppression of evidence by, for example, witness intimidation or concealment of evidence, if the jury found that he had engaged in such conduct. The jury was cautioned, however, that "such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your consideration." Defendant contends there was insufficient evidence to support the giving of the instruction.

---

[21] Defendant notes that CALJIC Nos. 2.51 and 2.52 were later amended to omit any reference to innocence.

Evidence produced at defendant's trial indicated that, on the night of the murder, he removed drawings from the Holley residence that April had done for him and which identified him by a nickname she had given him. Later, while he was in flight, he called Bob Marshall, Sr., and asked him to "put up" the pictures. Defendant maintains that this evidence was insufficient to demonstrate that he concealed any evidence. We disagree. The evidence suggested that, by removing the drawings after the crime and then later asking Bob Marshall, Sr., to "put up" the drawings, defendant was attempting to conceal evidence that he had been a recent visitor to the Holley residence and had had contact with the victim. This evidence was sufficient to justify giving the instruction. (*People v. Wilson* (2005) 36 Cal.4th 309, 330 [30 Cal.Rptr.3d 513, 114 P.3d 758]; *People v. Jackson, supra,* 13 Cal.4th at p. 1225.) In any event, even if the instruction was given in error, any error was harmless in light of the evidence of defendant's guilt.

### ii. *CALJIC No. 2.52*

Defendant contends the trial court violated his due process rights by instructing the jury with the standard flight instruction, on the ground that the prosecution failed to prove that his departure from Tulare County the day after April's murder constituted flight. Defendant maintains this is a preliminary foundational fact that must be established before the instruction can be given. Defendant claims there was evidence that he had planned to leave Tulare for the San Francisco Bay Area several days before the murder.

 The evidentiary basis for the flight instruction requires sufficient, not uncontradicted, evidence. (*People v. Cannady* (1972) 8 Cal.3d 379, 391 [105 Cal.Rptr. 129, 503 P.2d 585].) Moreover, section 1127c "makes mandatory the giving of an instruction on flight where evidence of a defendant's flight is relied upon as tending to show guilt, and the giving of such an instruction in appropriate cases repeatedly has been approved." (*Cannady,* at p. 391, fn. omitted.) Finally, the instruction applied only *if* the jurors found flight had been shown; if they did not so find here, they would have disregarded the flight instruction as they were also instructed. (CALJIC No. 17.31; *People v. Jackson, supra,* 13 Cal.4th 1164, 1225; *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1472 [2 Cal.Rptr.3d 875].)

### iii. *CALJIC No. 2.71.5*

Defendant contends that the trial court violated his due process rights when it gave CALJIC No. 2.71.5, the standard instruction on adoptive admissions. That instruction permits the jury to assess a defendant's failure to deny an accusation or a defendant's false, evasive, or contradictory statements in the face of an accusation as an admission of the truth of the accusation under

circumstances where the defendant reasonably had an opportunity to reply and heard and understood the nature of the accusation. Defendant contends that he did not remain silent in the face of police questioning but "talked and talked and talked." This is true, but, as the trial court essentially found when it overruled his objection to the instruction, much of that talk was false, evasive and contradictory when he was confronted by the accusation that he was a participant in April's murder. (Cf. *People v. Fauber* (1992) 2 Cal.4th 792, 852 [9 Cal.Rptr.2d 24, 831 P.2d 249] [given the inferences "that the defendant heard and understood [an unavailable witness's] statements and had the opportunity to deny them, and that he chose to remain silent except for an evasive and equivocal statement," the statements were "properly allowed as adoptive admissions"].) Moreover, the jury was instructed that it alone was to decide whether an admission was made and to view with caution evidence of such admission. Under these circumstances the giving of the instruction was appropriate and did not violate any of defendant's constitutional rights.

### e. *CALJIC Nos. 3.00, 3.01, 3.02*

Defendant challenges three instructions given by the trial court that defined principals to a crime as including both the direct perpetrator and aiders and abettors (CALJIC No. 3.00; § 31); further defined aiding and abetting (CALJIC No. 3.01); and set forth the natural and probable consequences doctrine (CALJIC No. 3.02).

 Defendant first maintains that the natural and probable consequences doctrine as reflected in CALJIC No. 3.02 unconstitutionally imposes criminal liability based on a negligence standard. Not so. "[W]e reject the premise of [defendant's] argument that the application of the natural and probable consequences doctrine in capital cases unconstitutionally predicates murder liability on mere negligence. Liability as an aider and abettor requires knowledge that the perpetrator intends to commit a criminal act together with the intent to encourage or facilitate such act; in a case in which an offense that the perpetrator actually commits is different from the originally intended crime, the natural and probable consequences doctrine limits liability to those offenses that are reasonably foreseeable consequences of the act originally aided and abetted." (*People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 108.)

Similarly, we have previously rejected the argument, advanced by defendant here, that the natural and probable consequences doctrine unconstitutionally presumes malice on the part of the aider and abettor. (*People v. Garrison* (1989) 47 Cal.3d 746, 777–778 [254 Cal.Rptr. 257, 765 P.2d 419]; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1231–1232 [249 Cal.Rptr. 71, 756 P.2d 795]; see also *People v. Culuko* (2000) 78 Cal.App.4th 307, 322 [92 Cal.Rptr.2d

789] ["The [California] Supreme Court has repeatedly rejected the contention that an instruction on the natural and probable consequences doctrine is erroneous because it permits an aider and abettor to be found guilty of murder without malice"].)

Finally, in a lengthy and convoluted argument, defendant appears to contend that the natural and probable consequences instruction was deficient because it did not inform the jury that defendant could not be convicted based on the natural and probable consequences doctrine unless he recognized that murder was the natural and probable consequence of the target offenses. First, we reject any challenge to the adequacy of CALJIC No. 3.02's explication of the natural and probable consequences doctrine. Second, defendant's reliance on *People v. Prieto* (2003) 30 Cal.4th 226 [133 Cal.Rptr.2d 18, 66 P.3d 1123], a case in which the trial court failed to identify and define the target offenses (*id.* at p. 252) is inapposite, as that error did not occur here. Third, to the extent defendant's argument is the same argument advanced in *People v. Coffman and Marlow*, *supra*, 34 Cal.4th 1, we reject it for the same reasons given there: "To the extent [defendant] contends that imposition of liability for murder on an aider and abettor under this doctrine violates due process by substituting a presumption for, or otherwise excusing, proof of the required mental state, [he] is mistaken. Notably, the jury here was also instructed with CALJIC No. 3.01, advising that an aider and abettor must act with the intent of committing, encouraging or facilitating the commission of the target crime, as well as CALJIC No. 8.81.17, which required, for a true finding on the special circumstance allegations, that defendant[] had the specific intent to kill the victim. These concepts fully informed the jury of applicable principles of vicarious liability in this context." (*Id.* at p. 107.)

### f. *CALJIC No. 3.03*

Without objection by defendant, the trial court instructed the jury with CALJIC No. 3.03 as follows: "One who has aided and abetted the commission of a crime, may end his responsibility by notifying the other party or parties of whom he had knowledge of his intention to withdraw from the commission of the crime and by doing everything in his power to prevent its commission."[22] Defendant asserts, without any citation to authority, that this instruction "imposes an unreasonable burden on the person desiring to withdraw from the criminal activity." The instruction is a correct statement of the law. (*People v. Norton* (1958) 161 Cal.App.2d 399, 403 [327 P.2d 87].) Insofar as defendant contends that it should have been modified, his failure to

---

[22] Defendant excuses his failure to object to this and other instructions with section 1259 which states in relevant part: "The appellate court may also review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."

seek such modification forfeits the claim. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1134 [40 Cal.Rptr.3d 118, 129 P.3d 321] [while the court may review unobjected-to instruction that allegedly implicates defendant's substantial rights, claim that instruction, correct in law, should have been modified "is not cognizable, however, because defendant was obligated to request clarification and failed to do so"].)

g. *Failure to Give Instructions on Accomplice Testimony; CALJIC No. 2.27*

Defendant contends the trial court erred when it failed to give a series of instructions regarding accomplice testimony with respect to the testimony of Bobby Joe Marshall, Jr. He maintains that the evidence established Marshall was an accomplice as a matter of law and, therefore, the jury should have been instructed with CALJIC Nos. 3.10 (defining accomplice), 3.11 (requiring corroboration of accomplice testimony), 3.12 (defining the quantum of evidence sufficient to corroborate accomplice testimony), 3.13(precluding the corroboration by one accomplice of another accomplice's testimony), 3.14 (criminal intent necessary to make one an accomplice), 3.18 (accomplice's testimony should be viewed with distrust), and 3.19 (defendant had burden to prove by preponderance that witness was an accomplice).

■■■ We reject defendant's claim that the evidence established Marshall was an accomplice as a matter of law. Section 1111, which requires corroboration of accomplice testimony with "such other evidence as shall tend to connect the defendant with the commission of the offense," defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." "To be so chargeable, the witness must be a principal under section 31. That section defines principals as '[a]ll persons concerned in the commission of a crime, whether . . . they directly commit the act constituting the offense, or aid and abet in its commission . . . .' (§ 31.) An aider and abettor is one who acts with both knowledge of the perpetrator's criminal purpose and the intent of encouraging or facilitating commission of the offense. Like a conspirator, an aider and abettor is guilty not only of the offense he intended to encourage or facilitate, but also of any reasonably foreseeable offense committed by the perpetrator he aids and abets." (*People v. Avila* (2006) 38 Cal.4th 491, 564 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) A person is an accomplice as a matter of law only if " 'there is no dispute as to either the facts or the inferences to be drawn therefrom.' [Citation.]" (*People v. Hayes* (1999) 21 Cal.4th 1211, 1271 [91 Cal.Rptr.2d 211, 989 P.2d 645].)

The evidence in this case did not establish Marshall was an accomplice in the sexual assault and murder of April Holley as a matter of law under the

standard articulated above. There was evidence that Marshall admitted to one witness that he was present at the Holley trailer on the night of the murder and had engaged in sexual intercourse with April, and that another witness overheard him talking to defendant and Brown the next morning about getting their stories straight. On the other hand, Marshall testified at defendant's trial and denied that he had been present or had had any sexual contact with April. While it is true, as defendant notes, that Marshall was at one point charged with April's murder, it is also true that after he told police defendant had confessed to him, the charges were dropped. On this record then, it cannot be said that the evidence that Marshall was an accomplice to the murder was undisputed either in terms of the facts or the inferences to be drawn therefrom.

Whether the evidence was sufficient to have required the trial court to give the accomplice instructions sua sponte presents a closer question. " ' "[W]henever the testimony given upon the trial is sufficient to warrant the conclusion upon the part of the jury that a witness implicating a defendant was an accomplice," ' the trial court must instruct the jury, sua sponte, to determine whether the witness was an accomplice." (*People v. Zapien* (1993) 4 Cal.4th 929, 982 [17 Cal.Rptr.2d 122, 846 P.2d 704].) As defendant notes, even the prosecutor disbelieved Marshall's claim that he had not been present at the Holley residence the night of the murder and so informed the jury. Nonetheless, mere "presence at the scene of a crime or failure to prevent its commission [is not] sufficient to establish aiding and abetting." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 90 [270 Cal.Rptr. 817, 793 P.2d 23].) Here, there was no physical evidence to support the conclusion that Marshall aided and abetted the assault upon and murder of April Holley, unlike the hair and semen evidence that implicated defendant and Brown, and neither of Marshall's statements—the one he made to Vicky Lopez or the one overheard by Kim Fleeman—incriminated Marshall in the murder.

In any event, even assuming error, "[a] trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is 'sufficient corroborating evidence in the record.' [Citation.] To corroborate the testimony of an accomplice, the prosecution must present 'independent evidence,' that is, evidence that 'tends to connect the defendant with the crime charged' without aid or assistance from the accomplice's testimony. [Citation.] Corroborating evidence is sufficient if it tends to implicate the defendant and thus relates to some act or fact that is an element of the crime. [Citations.] ' "[T]he corroborative evidence may be slight and entitled to little consideration when standing alone." [Citation.]' " (*People v. Avila, supra,* 38 Cal.4th at pp. 562–563.)

Here, as our recitation of the evidence in this case makes clear, Marshall's testimony was not a pivotal part of the case against defendant and it was

amply corroborated by other evidence of defendant's guilt. Moreover, Marshall's veracity was questioned even by the prosecutor and it was certainly unnecessary to instruct the jury to view his testimony with distrust. Thus, any error in failing to give the accomplice testimony instructions was harmless.

In a corollary claim, defendant maintains that the trial court's failure to give accomplice instructions rendered erroneous CALJIC No. 2.27, which informed the jury that the uncorroborated testimony of a single witness is sufficient for proof of that fact. The instruction also told the jury, however, that it was free to assign such uncorroborated testimony any weight and should carefully review all evidence upon which proof of a fact established by uncorroborated testimony depends. Defendant asserts that this instruction allowed the jury to convict defendant based on Marshall's uncorroborated testimony.

As noted above, Marshall was not an accomplice as a matter of law and it is not even clear the evidence would have supported submitting to the jury the issue of whether he was an accomplice. In any event, we "do not believe a reasonable juror would have been so misled" by the instruction (*People v. Moore* (1988) 47 Cal.3d 63, 87 [252 Cal.Rptr. 494, 762 P.2d 1218]), and based his or her decision solely on the uncorroborated testimony of Marshall that defendant confessed to him, given that even the prosecutor who presented the evidence disavowed Marshall's testimony, and given the substantial corroborative evidence of defendant's guilt.

### h. *CALJIC No. 3.31.5*

The jury was instructed with CALJIC No. 3.31 that "in each of the crimes charged, and the allegations charged in counts one, two, three, four and five of the Information, there must exist a union, or joint operation, of act or conduct and a certain specific intent in the mind of the perpetrator. Unless such specific intent exists the crimes or allegations as to which it relates are not committed." Defendant contends the trial court erred by not giving, sua sponte, CALJIC No. 3.31.5. That instruction provides in relevant part: "In the crime[s] charged in Count[s] __, __ and __ . . . there must exist a union or joint operation of act or conduct and a certain mental state in the mind of the perpetrator. Unless this mental state exists the crime to which it relates is not committed." The point of defendant's argument, insofar as it can be ascertained, is that the failure of the court to have given this instruction may have left the jury in doubt about the necessity for the concurrence of act and intent. (See § 20.)

There was no error. CALJIC No. 3.31 informed the jury that the crimes charged required a union of act and intent "in the mind of the perpetrator,"

and there was no issue raised by the evidence regarding the concurrence of intent and conduct. In the absence of any factual issue regarding concurrence, there is no basis upon which to conclude that the jury's verdict was in any way affected by the alleged instructional error. (Cf. *People v. Cleaves* (1991) 229 Cal.App.3d 367, 381 [280 Cal.Rptr. 146] [even assuming trial court erred in failing to instruct on concurrence between act and general intent, any error was harmless in light of instruction given and absence of any factual dispute regarding concurrence].)

### i. CALJIC No. 4.50

Defendant contends that the trial court erroneously rejected his proposed modification of CALJIC No. 4.50. The proposed modification is set forth in italics: "The defendant in this case has introduced evidence for the purpose of showing that he was not present at the time and place of the commission of the alleged crimes for which he is here on trial. *The burden of proof is always on the prosecution. It never shifts to the defendant. The defendant is not required to prove beyond a reasonable doubt or even by a preponderance of the evidence that he was not present at the time and place of the commission of the alleged crimes.* If, after consideration of all the evidence, you have a reasonable doubt that the defendant was present at the time the crime was committed, you must find him not guilty." The instruction, minus the modification, was read to the jury. Defendant asserts the modification was proper because it tracks language in a federal instruction that states, "The government has the burden of establishing beyond a reasonable doubt the defendant's presence at that time and place." (Manual of Model Crim. Jury Instns. (9th Cir. 1997 ed.) Instn. No. 6.1.) Defendant claims his modification, like the federal instruction, "simply emphasized the burden of proof."

■ Defendant's modification went far beyond emphasis and strayed into the argumentative. The trial court properly rejected it. (*People v. Williams* (1988) 45 Cal.3d 1268, 1323–1324 [248 Cal.Rptr. 834, 756 P.2d 221] ["It is long settled . . . that a court may properly refuse an instruction that is argumentative in nature"].) Moreover, to the extent it repeated a legal principle covered by other instructions relating to reasonable doubt, such as CALJIC No. 2.90, it was properly rejected as repetitious. (*People v. Garceau* (1993) 6 Cal.4th 140, 192–193 [24 Cal.Rptr.2d 664, 862 P.2d 664].)

### j. CALJIC No. 4.71

Defendant contends that the trial court violated his due process rights when, over his objection, it instructed the jury with CALJIC No. 4.71, which stated: "When, as in this case, it is alleged that the crime charged was committed 'on or about' a certain date, if you find that the crime was

committed, it is not necessary that the proof show that it was committed on that precise date; it is sufficient if the proof shows that the crime was committed on or about that date." Defendant claims that the instruction was improper because the prosecution argued at trial that April was murdered by defendant on the night of December 3, sometime between 9:00 and 10:00 p.m. and he provided an alibi for this timeframe.

"The comment to CALJIC No. 4.71 states in pertinent part: 'This instruction is improper if the People's evidence fixes the commission of the offense at a particular time to the exclusion of any other time and the defendant has presented evidence of an alibi as to that particular time. . . .' This comment accurately recognizes the rule as developed by the courts." (*People v. Jones* (1973) 9 Cal.3d 546, 557 [108 Cal.Rptr. 345, 510 P.2d 705].) "Ordinarily, the People need not plead the exact time of commission of an alleged offense. (Pen. Code, § 955.) However, if the defense is alibi . . . the exact time of commission becomes critically relevant to the maintenance of the defense. An instruction which deflects the jury's attention from temporal detail may unconstitutionally impede the defense." (*People v. Barney* (1983) 143 Cal.App.3d 490, 497 [192 Cal.Rptr. 172].)

At trial, the prosecutor argued that the instruction was proper because the prosecution had not made an irrevocable choice regarding the timing of the murder and that he should be free to argue that the murder occurred on the evening of December 3 or in the early morning of December 4. After initially indicating it would not give the instruction because of a defense objection, the trial court decided to give the instruction. Although the prosecution reserved the right to argue the murder occurred in the early morning hours of December 4, in fact the prosecutor argued that the murder occurred between 9:00 and 10:00 p.m. on December 3 based on evidence that April was heard screaming by three different people. Therefore, it appears that the prosecution made an election regarding the time of the murder.

On the other hand, as the Attorney General notes, defendant presented, at best, only a partial alibi for his whereabouts during this time. Defendant left the Hernandez house around 9:10 p.m. Bob Marshall, Sr., testified that defendant was back at the Marshall trailer at 10:00 p.m., but Tammy Petrea testified that he appeared at Jimmy Rousanvall's bus about 11:00 p.m., while still another prosecution witness testified he saw defendant in the vicinity of the Holley residence at 11:30 p.m. with someone who fit Steven Brown's description.

Given this state of the evidence—where the prosecution could have argued that the murder occurred sometime between 9:00 p.m. and 11:30 p.m. of December 3, if not in the early morning of December 4, and the inability of

the defense to have established a firm alibi for defendant during this timeframe, the trial court did not err in deciding to give the instruction. It did not deflect the jury's attention from a crucial temporal element for which the defendant had an alibi. The prosecution's subsequent election during argument of a specific time period—from 9:00 to 10:00 p.m.—did not render the instruction erroneous so much as irrelevant.

"In reviewing [a] purportedly erroneous instruction[], 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' [Citation.] In conducting this inquiry, we are mindful that ' "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." ' [Citations.]" (*People v. Frye, supra,* 18 Cal.4th at p. 957.) "Additionally, we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." (*People v. Mills* (1991) 1 Cal.App.4th 898, 918 [2 Cal.Rptr.2d 614].) In this case, the jury was additionally instructed: "The purpose of the court's instructions is to provide you with the applicable law so that you may arrive at a just and lawful verdict. Whether some instructions apply will depend upon what you find to be the facts. Disregard any instruction which applies to facts determined by you not to exist. Do not conclude that because an instruction has been given that I am expressing an opinion as to the facts."

We conclude, therefore, that the instruction was not erroneously given and that, to the extent it became irrelevant, there is no reasonable likelihood it was applied in a manner that resulted in a constitutional violation.

### C. Penalty Phase Issues

#### 1. Effect of Guilt Phase Errors on Penalty Phase

Defendant contends that the Eighth Amendment requires that his death sentence be reversed because of the cumulative effect of guilt phase errors unless the People demonstrate that those errors were harmless beyond a reasonable doubt, even if these errors are found to be harmless in the context of the guilt phase. No authority directly supports this claim. Moreover, given that we have either rejected defendant's claims of error or found the errors harmless, we conclude further that "there is no reasonable possibility that these errors, singly or in combination, affected the jury's verdict." (*People v. Brown* (1988) 46 Cal.3d 432, 463 [250 Cal.Rptr. 604, 758 P.2d 1135].)

### 2. "Double Counting" of Special Circumstances and Consideration of Sodomy Special Circumstance

Relying on language in *People v. Harris* (1984) 36 Cal.3d 36 [201 Cal.Rptr. 782, 679 P.2d 433], defendant argues that the trial court erroneously instructed the jury it could consider the lewd act special circumstance because the underlying conduct also supported the rape and sodomy special circumstances. Defendant fails to note, however, that in *People v. Melton* (1988) 44 Cal.3d 713 [244 Cal.Rptr. 867, 750 P.2d 741], "a majority of the court declined to adopt this portion of the *Harris* plurality opinion, and held that it is not improper for a penalty jury to take into consideration the fact that a murder was committed in the course of two statutorily enumerated felonies, even if the felonies were part of an indivisible course of conduct." (*People v. Ramirez* (1990) 50 Cal.3d 1158, 1197 [270 Cal.Rptr. 286, 791 P.2d 965].)

As we explained in *Melton*, which involved burglary and robbery special circumstances, "it is constitutionally legitimate for the state to determine that a death-eligible murderer is more culpable, and thus more deserving of death, if he not only robbed the victim but committed an additional and separate felonious act, burglary, in order to facilitate the robbery and murder." (*People v. Melton, supra,* 44 Cal.3d at p. 767; accord, *People v. Davis* (1995) 10 Cal.4th 463, 545–546 [41 Cal.Rptr.2d 826, 896 P.2d 119] [jury may consider both kidnapping and sodomy special circumstances as multiple factors in aggravation even though the crimes were part of a single course of conduct].)

As we have explained in rejecting defendant's claim that insufficient evidence supported his lewd conduct conviction, lewd conduct is a separate offense from either rape or sodomy and therefore the jury could consider all three special circumstances under section 190.3, factor (a), which authorizes the jury, in determining the penalty, to consider, inter alia, "the existence of any special circumstances found to be true pursuant to Section 190.1." (See, *ante,* at p. 1018.)

In a related argument, defendant contends that the trial court's error in instructing the jury on felony murder based on sodomy should have precluded the jury's consideration of the sodomy special circumstance. As the Attorney General observes, however, while sodomy was not an offense enumerated in the felony murder statute in 1988, it was among the offenses listed in the special circumstance statute in 1988. Therefore, the jury properly considered it at the penalty phase. (§ 190.3, factor (a).) Defendant's claim that the trial court's "erroneous instruction on felony murder could have influenced the jury's true finding on the sodomy special circumstance allegation" is sheer speculation.

### 3. Evidentiary Rulings

#### a. Testimony of Michael M.

 Section 190.3 authorizes the admission of evidence, as a factor in aggravation, regarding "the presence or absence of other criminal activity by the defendant which involved the use or attempted use of force or violence or which involved the express or implied threat to use force or violence . . . ." (See also § 190.3, factor (b).) Under this rubric, the prosecution presented the testimony of Michael M., who had been an inmate with defendant in the Alameda County jail, that defendant, after learning M. had been convicted of rape, forced M. to orally copulate him and then subsequently sexually assaulted him 10 to 20 times. Over a defense objection, M. also testified that defendant was the "head white representative of the barracks" and in that capacity he told M. he would have to take care of defendant's friends; M. did perform sex acts on other inmates for defendant. In admitting this testimony, the trial court agreed with the prosecution that it was admissible as evidence that defendant aided and abetted Steven Brown in the sexual assault on April Holley and that it was also relevant in light of evidence that defendant had participated in the gang rape of Gina I.

Defendant advances a number of challenges to the trial court's admission of this evidence. None has merit.

Defendant first contends the admission of evidence that defendant was "head white representative" was error in light of *Dawson v. Delaware* (1992) 503 U.S. 159 [117 L.Ed.2d 309, 112 S.Ct. 1093].) In *Dawson,* the Supreme Court held that admission into evidence of the defendant's membership in a White supremacist gang at the penalty phase of his murder trial violated the First and Fourteenth Amendments because the evidence was irrelevant to any issue in the proceeding. (*Dawson,* at pp. 165–169.) In this case, however, the trial court concluded that defendant's leadership role in the unnamed "White" group was relevant—not to demonstrate that defendant was a racist—but to explain his influence over other inmates who also sexually assaulted M. at defendant's instigation and with his encouragement. This, in turn, was relevant to defendant's participation as an aider and abettor in group sexual assaults. We conclude that the trial court did not abuse its discretion in admitting this testimony.

Defendant also argues, in essence, that insufficient evidence supported the uncharged criminal activity because it rested on M.'s testimony alone. Not so. It is well settled that, under the prevailing standard of review for a sufficiency claim, we defer to the trier of fact's evaluation of credibility. (*People v. Snow, supra,* 30 Cal.4th at p. 66.) Moreover, the testimony of a single witness is

sufficient for the proof of any fact. (See *People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 884–885 [123 Cal.Rptr. 119, 538 P.2d 247].) Defendant provides us with no reason to depart from these principles.

Next, defendant maintains that the statute of limitations had run on his sexual assault of M. and should have precluded the admission of M.'s testimony. We have repeatedly rejected this claim. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1061 [90 Cal.Rptr.2d 607, 988 P.2d 531] ["The court did not err in admitting evidence of crimes for which charges were never brought or were dismissed as part of plea bargains, and on which the statute of limitations had expired."]; *People v. Medina* (1995) 11 Cal.4th 694, 772 [47 Cal.Rptr.2d 165, 906 P.2d 2] ["neither remoteness nor the expiration of the statutory limitations period bars admission of a defendant's prior unadjudicated criminal activity for purposes of section 190.3, factor (b)"].) We do so again here.

We have also repeatedly rejected, and again reject, defendant's final claim that section 190.3 violates due process by allowing the penalty phase jury to consider unadjudicated criminal activity. (*People v. Bolin, supra*, 18 Cal.4th at p. 335; *People v. Balderas, supra*, 41 Cal.3d at pp. 204–205.)

### b. *Evidence of Defendant's Abuse of a Child*

As previously noted, the prosecution presented evidence that defendant injured the genitals of Richard O., the eight-month-old son of his then girlfriend, which required that the child be hospitalized, and then denied he had done so, saying he loved the child as if the child were his own, and was not a child abuser. Defendant was convicted of misdemeanor battery as a result of this incident.

Defendant claims that it was error for the trial court to have admitted the facts underlying the misdemeanor conviction. As he concedes, we have rejected similar arguments that admission of violent conduct underlying a conviction violates any federal constitutional right. "When dealing with violent conduct it is not the *fact* of conviction which is probative in the penalty phase, but rather the *conduct* of the defendant which gave rise to the offense. . . . [T]he convictions here involved *violent* conduct and were thus admissible pursuant to subdivision (b) of section 190.3, which permits the introduction of all evidence of violent crimes and does not require a conviction." (*People v. Gates* (1987) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666, 743 P.2d 301]; see *People v. Monterroso* (2004) 34 Cal.4th 743, 774 [22 Cal.Rptr.3d 1, 101 P.3d 956] [rejecting claim that evidence of circumstances underlying battery and vandalism convictions violated double jeopardy prohibition].) We adhere to the conclusion of our prior cases.

Defendant claims that the prosecutor misstated his burden of proof with respect to defendant's prior conviction by informing the jury he had no burden to prove defendant made the statements attributed to him. We have examined the passage in the record cited by defendant and in it the prosecutor makes no such statement; he simply argues that defendant lied when he told an investigator that he had not injured the child. This statement was no more than a fair inference from the evidence that defendant had been convicted of battery upon the infant. Defendant also asserts that the trial court misstated the burden of proof in its instructions, but the instruction the court gave—that the prosecution was required to prove prior convictions beyond a reasonable doubt—was entirely correct. Defendant neither objected to this instruction nor sought clarification.

### c. *Exclusion of Results of Defendant's Polygraph Test*

At trial, defendant filed a motion to declare unconstitutional Evidence Code section 351.1, which generally bans the admission of polygraph test results in criminal proceedings. Defendant argued that such test results should be "admitted under the more permissive evidentiary standards of a penalty trial." As a preliminary matter, he stated his intention to call Edward I. Gelb, "a recognized expert in the administration of polygraph examinations," to testify that results were acceptable for purposes of the penalty phase proceedings. The trial court denied the motion and excluded the results.

On appeal, defendant argues that the court's ruling violated various constitutional rights including his right to due process and the right to present a defense. He seeks to distinguish other capital appeals in which we have affirmed the exclusion of polygraph results on the ground that, in those cases, an offer of proof of the scientific reliability of the procedure had not been made whereas, in this case, it was. (E.g., *People v. Burgener* (2003) 29 Cal.4th 833, 870–871 [129 Cal.Rptr.2d 747, 62 P.3d 1]; *People v. Koontz* (2002) 27 Cal.4th 1041, 1090 [119 Cal.Rptr.2d 859, 46 P.3d 335]; *People v. Ayala, supra,* 23 Cal.4th at p. 264; *People v. Price* (1991) 1 Cal.4th 324, 419 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

 However, in *People v. Wilkinson* (2004) 33 Cal.4th 821 [16 Cal.Rptr.3d 420, 94 P.3d 551], a case in which the defendant had made an offer of proof regarding the reliability of polygraph examinations, we none-theless squarely held that the categorical exclusion of the results of such examinations did not violate the federal Constitution. (*Wilkinson,* at p. 850; see also *People v. Maury* (2003) 30 Cal.4th 342, 413–414 [133 Cal.Rptr.2d 561, 68 P.3d 1] [exclusion of polygraph evidence at guilt phase did not violate defendant's constitutional right to present a defense].)

As we observed in *Wilkinson*, a seven-member majority of the United States Supreme Court in *United States v. Scheffer* (1998) 523 U.S. 303 [140 L.Ed.2d 413, 118 S.Ct. 1261] upheld a per se exclusion of polygraph evidence in the Military Rules of Evidence. (*People v. Wilkinson, supra*, 33 Cal.4th at p. 849.) We observed "that in light of *Scheffer*, '[e]xcluding such evidence does not violate defendant's constitutional right to present a defense.' [Citation.] Noting that '[i]mplicit in the Legislature's passage of Evidence Code section 351.1 is the conclusion that "[L]ie detector tests themselves are not considered reliable enough to have probative value" . . . ,' and quoting *Scheffer*, we concluded that a 'per se rule excluding polygraph evidence is a "rational and proportional means of advancing the legitimate interest in barring unreliable evidence." [Citation.]' [Citation.] [¶] We reach the same conclusion here. *Scheffer* noted that 'the scientific community remains extremely polarized about the reliability of polygraph techniques.'. . . This disagreement in the scientific community in turn has been reflected 'in the disagreement among state and federal courts concerning both the admissibility and the reliability of polygraph evidence.' [Citation.]" (*Wilkinson, supra*, at pp. 849–850.)

██ Defendant seeks to avoid the impact of *Wilkinson* because *Wilkinson* was not a capital case. As he did in the trial court, defendant argues that laxer rules for the admission of evidence apply at penalty phase proceedings. Not so. The death penalty statute does not adopt any new rules of evidence peculiar to itself, but simply allows the generally applicable rules of evidence to govern. Defendant confuses the broader range of evidence deemed relevant at the penalty phase—victim impact evidence, for example—with the technical rules of evidence that remain in effect during those proceedings. One such rule is embodied in Evidence Code section 351.1, and it has equal application to noncapital and capital trials and to both the guilt and penalty phases of the latter. There is no less of an imperative to prevent unreliable evidence from being admitted at the penalty phase than at the guilt phase of a capital trial. Accordingly, we reject defendant's claim of error with respect to exclusion of polygraph evidence.

### 4. *Denial of Motion for Modification of the Death Verdict*

Defendant contends the trial court was derelict in its duty under section 190.4, which provides for an automatic motion to modify the death verdict, because the court "failed to follow the legal requirements" in denying the motion and "minimized the mitigating factors or ignored them, while at the same time exaggerating the aggravating factors and giving them undue weight." These claims are meritless.

██ Defendant argues that the trial court violated his rights by its "premature decision to impose death" as evidenced by a tentative written

ruling. Not so. "The practice of formulating tentative rulings in advance of argument and reducing those tentative rulings to writing is commonplace and unobjectionable." (*People v. Medina, supra*, 11 Cal.4th at p. 783.) The mere fact the trial court did so is not evidence that it prejudged the motion or was impervious to defendant's arguments.

As to defendant's second point, we have carefully examined the trial court's statement in connection with its denial of the motion. At the outset, the trial court plainly stated the legal standard it was required to follow in ruling on the motion, that is, an independent review of the motion taking into account evidence of aggravation and mitigation. The trial court then proceeded to do so, at some length. "Defendant disagrees in many ways with the court's view of the evidence—particularly the weight it gave his evidence in mitigation. But defendant's view of the evidence is not the only permissible one. Although the court must *consider* all proffered mitigating evidence, as this court did, it need not find that any particular evidence is in fact mitigating under the circumstances." (*People v. Steele, supra*, 27 Cal.4th at pp. 1267–1268.) Our review of the court's ruling leads us to conclude that it carefully and conscientiously performed its duty under section 190.4.

### 5. *Intercase Proportionality*

Defendant argues that California's failure to conduct intercase proportionality review of death sentences violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. " 'Neither the federal nor the state Constitution requires intercase proportionality review' [citation], and we have consistently rejected this argument. [Citations.]" (*People v. Geier, supra*, 41 Cal.4th at p. 618.)

### 6. *Claims of Instructional Error*

#### a. *CALJIC No. 8.87*

██ Defendant maintains that CALJIC No. 8.87, given here, was flawed because it told the jury that the uncharged crime of forcible oral copulation on Michael M. involved the use of force or violence, or threat thereof, rather than allowing the jury to decide whether force or violence were involved. He claims that this amounted to a directed verdict on the issue. Not so. Forcible oral copulation is, by definition, a crime involving the use of force or violence. However, the jury could not consider it for purposes of aggravation unless and until the prosecution proved beyond a reasonable doubt that defendant committed the offense. (*People v. Robertson* (1982) 33 Cal.3d 21,

53–54 [188 Cal.Rptr. 77, 655 P.2d 279].) Having so found, it would necessarily have found the force or violence element.

### b. *CALJIC No. 8.85*

Defendant contends that CALJIC No. 8.85, given here, was flawed because it informed the jury that, in determining the sentence, it could consider whether the offense was committed while defendant was under the influence of "extreme mental or emotional disturbance." Defendant argues that the modifier "extreme" was an unconstitutional limitation. We have previously and repeatedly rejected this claim. (*People v. Brown, supra*, 33 Cal.4th at p. 402; *People v. Ghent, supra*, 43 Cal.3d at p. 776.)

### c. *Defense Instruction on Mitigating Factors*

Defendant contends the trial court erroneously denied his requested instruction which set forth 11 "factors" the jury could consider in mitigation, including for example, "Whether the defendant's childhood psychological growth and development affected his adult psychology and personality," "[w]hether the defendant suffers from a learning disability," and "[w]hether the defendant's addiction to alcohol and drugs, and its effect upon his behavior, contributed to his criminal conduct." The trial court declined to submit this list to the jury because it encroached upon the jury's right to determine whether these were factors in mitigation. Defense counsel responded by withdrawing the list in favor of retaining the preamble to the list as follows: "Mitigating factors may include any sympathetic, and compassionate, merciful or other aspect of the defendant's background, character, record, or social, psychological, or medical history that the defendant offers as a basis for a sentence of less than death, whether or not the factors are related to the offense for which he is on trial." The trial court agreed to give this instruction. Additionally, the trial court instructed the jury that the mitigating factors the jury could consider were not limited to those listed but that it "could consider any other circumstances relating to the case or to the defendant as shown by the evidence as reasons for not imposing the death penalty."

The proffered defense listing of mitigating factors was argumentative and therefore not appropriate. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1276 [270 Cal.Rptr. 451, 792 P.2d 251].) Thus, the trial court properly declined to give that part of the instruction.

### d. *Defense Substitute Instruction for CALJIC No. 8.85*

The trial court gave CALJIC No. 8.85, the standard instruction regarding the section 190.3 factors in mitigation and aggravation and declined to give

an alternative instruction submitted by defendant. On appeal, defendant contends this was error because of deficiencies in the standard instruction, specifically, that the instruction contains irrelevant factors which, nonetheless, might be used against a defendant by the jury. He also asserts that the court erred by not instructing the jury that the absence of mitigation was not aggravation. As he concedes, we have rejected these arguments in the past and do so again. (*People v. Geier, supra,* 41 Cal.4th at pp. 619–620; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1266–1269 [74 Cal.Rptr.2d 212, 954 P.2d 475]; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1074 [5 Cal.Rptr.2d 230, 824 P.2d 1277].)

### e. *Other Instructional Error Claims*

Defendant contends the failure of the trial court to instruct on any burden of proof with respect to the penalty phase violated his constitutional rights. We have consistently rejected this claim and do so again here. (*People v. Geier, supra,* 41 Cal.4th at p. 618; *People v. Brown, supra,* 33 Cal.4th at p. 401 ["The death penalty law is not unconstitutional for failing to impose a burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence."].) We have considered and rejected defendant's claim that the trial court was required to instruct the jury on the presumption of a sentence of life without possibility of parole. (*People v. Arias* (1996) 13 Cal.4th 92, 190 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

### f. *Cumulative Effect of Instructional Error*

Defendant contends the cumulative effect of these instructional errors requires reversal. "If none of the claimed errors were individual errors, they cannot constitute cumulative errors that somehow affected the penalty verdict." (*People v. Beeler* (1995) 9 Cal.4th 953, 994 [39 Cal.Rptr.2d 607, 891 P.2d 153].)

### 7. *Challenges to the Death Penalty Statute*

Defendant contends the death penalty law is unconstitutional because it does not require unanimous written findings by the jury regarding aggravating factors. We have previously and consistently rejected this claim and do so again. (*People v. Geier, supra,* 41 Cal.4th at p. 618; *People v. Medina, supra,* 11 Cal.4th at p. 782.) We have also repeatedly considered and rejected the claims defendant raises that (1) the death penalty statute is unconstitutional because it confers too much discretion on individual prosecutors (*People v. Crittenden* (1994) 9 Cal.4th 83, 152 [36 Cal.Rptr.2d 474, 885 P.2d 887]);

(2) fails to meaningfully narrow the class of death-eligible offenders or is otherwise overbroad (*People v. Yeoman, supra,* 31 Cal.4th at p. 165); (3) is impermissibly vague (*People v. Jenkins* (2000) 22 Cal.4th 900, 1050–1053 [95 Cal.Rptr.2d 377, 997 P.2d 1044]); or (4) is unconstitutional on moral grounds. (*People v. Turner* (2004) 34 Cal.4th 406, 438 [20 Cal.Rptr.3d 182, 99 P.3d 505].)

### 8. *International Law*

Defendant contends that violations of his constitutional rights also violate international law. However, as the predicate for his claim—that his constitutional rights were violated—is erroneous, so too, then, is the conclusion he draws regarding international law. To the extent he challenges the death penalty itself as violative of international norms, we again reject this claim as we have done repeatedly and consistently in other cases. (*People v. Panah, supra,* 35 Cal.4th at pp. 500–501.)

### 9. *Prosecution Delay*

Defendant contends the delay in processing his appeal violates various constitutional provisions and international law. Not so. "One under judgment of death does not suffer cruel and unusual punishment by the inherent delays in resolving his appeal. If the appeal results in reversal of the death judgment, he has suffered no conceivable prejudice, while, if the judgment is affirmed, the delay has prolonged his life." (*People v. San Nicolas* (2004) 34 Cal.4th 614, 677 [21 Cal.Rptr.3d 612, 101 P.3d 509]; see *People v. Panah, supra,* 35 Cal.4th at p. 500.)

### 10. *Missing Transcripts*

Defendant contends his conviction must be reversed because the parties were unable to reconstruct via a settled statement nine unreported bench conferences and a proceeding at defendant's first trial, apparently involving a continuance. "[D]efendant bears the burden of demonstrating that the appellate record is not adequate to permit meaningful appellate review. [Citations.] He has not done so." (*People v. Arias, supra,* 13 Cal.4th at p. 158.)

### 11. *Cumulative Error*

Defendant contends the cumulative effect of errors at both phases of his trial requires reversal. Not so. (*People v. Geier, supra,* 41 Cal.4th at p. 620.)

12. *Incorporation by Reference of Habeas Corpus Petition Claims*

Defendant asks that we deem incorporated by reference any argument he has raised in his petition for habeas corpus but which, in reviewing that petition, we may decide should have been raised on appeal. We decline to do so. The rules of court do not permit such incorporation. (See *Soukup v. Law Offices of Herbert Hafif* (2007) 39 Cal.4th 260, 294, fn. 20 [46 Cal.Rptr.3d 638, 139 P.3d 30].) Moreover, "habeas corpus cannot serve as a substitute for an appeal, and, in the absence of special circumstances constituting an excuse for failure to employ that remedy, the writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction." (*In re Dixon* (1953) 41 Cal.2d 756, 759 [264 P.2d 513].)

13. *Restitution*

 As part of his sentence, the trial court imposed upon defendant a $10,000 restitution fine pursuant to Government Code section 13967 without, however, making any findings regarding defendant's ability to pay. Defendant points out that, at the time he was sentenced, that section had recently been amended to condition imposition of such a fine on a defendant's ability to pay. (See *People v. Saelee* (1995) 35 Cal.App.4th 27, 30–31 [40 Cal.Rptr.2d 790].) That amendment itself was repealed in 1994, but the current statutory scheme in effect allows consideration of ability to pay. (§ 1202.4.)[23] Defendant contends he should have the benefit of either the 1992 amended statute or the current statutory scheme. In *People v. Vieira, supra,* 35 Cal.4th 264, faced with the same argument we concluded: "Defendant is not entitled to benefit from the 1992 amendment; it was repealed in 1994. (Stats. 1994, ch. 1106, § 3, [p.] 6547.) . . . Here, the question of restitution should be considered under the current version of Penal Code section 1202.4, which provides detailed guidance to the trial court in setting a restitution fine, including consideration of a defendant's ability to pay." (*Id.* at p. 305.) Therefore, we remanded the case to the trial court "for reconsideration of the question of a restitution fine under the currently applicable statute. If the People choose not to contest the matter on remand, defendant's restitution shall be reduced to the statutory minimum." (*Id.* at p. 306.) We shall follow that procedure here as well.

---

[23] Government Code section 13967 was repealed in 2003. (Stats. 2003, ch. 230, § 2.)

## DISPOSITION

The matter is remanded to the trial court for reconsideration of the question of a restitution fine in the manner set forth above. In all other respects, the judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied July 16, 2008, and the opinion was modified to read as printed above.